## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## OXFORD DIVISION

**JERRALD SIMPSON**

     **Plaintiff**

          **CIVIL ACTION: 3:17-cv-00007-MPM-**
**versus**           **JMV**

**HOME DEPOT U.S.A., INC.**

     **Defendant**

### HOME DEPOT'S MEMORANDUM IN SUPPORT
### OF MOTION FOR SUMMARY JUDGMENT

**I.**  **INTRODUCTION**

On January 12, 2017, Plaintiff filed a Complaint against Home Depot, alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. (Dkt. # 1). Home Depot is entitled to summary judgment on all of Plaintiff's claims.

**II.**  **SUMMARY OF THE ARGUMENT**

Plaintiff alleges that his race, African-American, was a substantial contributing cause of his termination from his position as Assistant Store Manager ("ASM"). Specifically, Plaintiff alleges that his supervisor, Store Manager Enoch "Drew" Gentry, held a "racial-based animosity" towards Plaintiff and treated Plaintiff differently from white employees who committed offenses, while Plaintiff alleges he "did not commit offenses." Plaintiff has no evidence to support his allegations. In reality, a simple review of Plaintiff's employment file at Home Depot shows that Plaintiff experienced a multitude of performance and behavioral issues

in his less than three years of working for Home Depot. Plaintiff was ultimately terminated due to yet another violation of Home Depot policy, this one related to asset protection and safety, while he was already on a Final Warning under Home Depot's progressive discipline policy.

Plaintiff cannot make a prima facie case of discrimination because Plaintiff cannot show that he was treated less favorably than similarly situated employees outside his protected class under nearly identical circumstances. In fact, within days of Plaintiff's termination, another ASM at the same store, who is Caucasian, was terminated for performance and behavioral issues. Ultimately, Plaintiff and the other ASM were replaced by two new ASM's, one African-American and one Caucasian. Thus, there was no change in the racial makeup of the management team.  Even if Plaintiff can make a *prima facie* case of discrimination, he cannot show that Home Depot's reasons for terminating him- his well-documented performance and behavioral issues- were a pretext for discrimination.

III.    **FACTS**

Plaintiff, an African-American male, began working for Home Depot at its Horn Lake, Mississippi store ("Horn Lake store") in May of 2013. (Exhibit A, Deposition Excerpts of Jerrald Simpson (hereafter "Exhibit A"), p. 22). It was not long thereafter that Mr. Simpson began to experience performance and behavioral issues.

A.    **Plaintiff's Performance Deficiencies Prior to Working for Store Manager Enoch "Drew" Gentry**

When Plaintiff interviewed for an ASM position at Home Depot, Josiah Cocke (Caucasian male), the Store Manager of the Horn Lake store at the time, was one of the interviewers. (Exhibit A, p. 19). Plaintiff believed he was treated fairly in the interview by Mr. Cocke. (Exhibit A, p. 20). Plaintiff then interviewed a second time, and this time James Turner, District Human Resources Manager ("DHRM") (Caucasian male), was one of the interviewers.

(Exhibit A, p. 20). Again, Plaintiff felt like he was treated fairly in the interview. (Exhibit A, p. 21). Ultimately, Plaintiff was offered an ASM position at the Horn Lake store, which was the store closest to his home. (Exhibit A, pp. 21-22). Plaintiff was originally the Merchandising ASM, and was responsible for the merchandising departments in the store, such as lumber, hardware, electrical, garden and paint. (Exhibit A, p. 27). Plaintiff managed the hourly department supervisors in those departments. (*Id.*) Plaintiff also was tasked with ensuring his departments were properly stocked and in shoppable condition. (*Id.*) When Plaintiff started in May of 2013, Mr. Cocke was the Store Manager of the Horn Lake store and was Plaintiff's direct supervisor. (Exhibit A, p. 25). The other two ASMs in the Horn Lake store were Caucasian at the time of Plaintiff's hire. (Exhibit A, p. 25). Shortly after, one of those ASM's transferred to another store, and was replaced by an African-American ASM. (Exhibit A, pp. 26-27). Plaintiff testified that he and Mr. Cocke had a good relationship when he started working. (Exhibit A, p. 28).

Plaintiff received a mid-year evaluation from Mr. Cocke in September of 2013. (Exhibit A, p. 63, Exhibit 2 thereto). This review accounted for the four months that Plaintiff had worked for Home Depot. The review was generally positive and offered Plaintiff some suggestions. (*Id.*) Thereafter, Mr. Cocke noted a dip in Plaintiff's performance.

For example, on November 16, 2013, Mr. Cocke submitted a Manager's Note[1] into Home Depot's performance tracking system, where he noted the following:

> I'm having a final informal coaching with Jerrald today about his People Skills. Jerrald and I have talked in private about this on 4 other occasions, this will be the 5th. In the other conversations I covered what was expected of leaders with HD. I explained that we

---

[1] Home Depot's performance tracking system allows management to submit observations and discussions with associates short of formal, written counseling. These observations are called "Manager's Notes." (Exhibit B, Declaration of Josiah Cocke, ¶ 5).

are servant leaders and that we're only as strong as our teams. In Jerralds mid year check in I ask him to read "Built from Scratch & Customer Mania because I felt these 2 books would help him understand HD's core values (Built from Scratch) and Customer Mania focuses on servant leadership, inverted pyramid and rewarding and recognizing great performance. It has now been 2 months and he hasn't read either and nothing has changed with his leadership style. I continue to get feedback from associates that are very disturbed and upset at the way he addresses them and handles issues. The associates say that he talks down to them and is rude and arrogant. In our past 4 informal coaching conversations I addressed these behaviors and have yet to see improvement, as a matter of fact I've received an increase in complaints about hew (sic) he addresses the team. At this point I'm collecting statements going forward (I will collect 3 or 4 on Monday on issues from this last Thursday night. Jerrald is a very smart person who is a high level thinker. He is detailed oriented and thorough with his follow up and has high standards as I've ask him to have high standards (I have high standards). On numerous occasions I've let Jerrald know that I was one of his biggest fans when it comes to these good traits. In these same conversations I also made it clear that his personal skills had much opportunity and that this area needed to be addressed immediately. Today I'm going to have yet another private talk with Jerrald about his lack of improvement in addressing our team. I've printed 3 book summaries from Knowledge Depot (Working Relationships, Motivating others through caring & Inspiration, Caring about Direct Reports)

(Exhibit B, Declaration of Josiah Cocke, ¶ 6, Exhibit 1 thereto). This Manager's Note comports with Plaintiff's testimony, wherein Plaintiff stated that he was a very meticulous manager who often received pushback from his subordinates about his management style. (Exhibit A, pp. 35-36). Plaintiff even admitted this in his Complaint. (Dkt. # 1, ¶ 5) ("As a result, some employees disliked Plaintiff.") Plaintiff also admitted that he was aware that some of his subordinates called the Associate Advice and Counsel Group ("AACG")[2] to complain about Plaintiff's interactions with them. (Exhibit A, p. 44).

---

[2] The AACG is Home Depot's centralized Human Resources call center located at Home Depot's Store Support Center in Atlanta, GA. It is staffed with human resources managers who are available to counsel with managers and supervisors, and associates regarding any work-related issues.

Mr. Cocke submitted another Manager's Note on February 27, 2014, where he again held back from issuing Plaintiff a formal counseling but noted some of Plaintiff's ongoing performance issues. (Exhibit B, ¶ 6, Exhibit 1 thereto). In the Manager's Note, Mr. Cocke stated:

> I've just had a conversation with Jerrald on the listed items below. I was going to move forward with the write up today but I'm comfortable with the discussion we've just had around the below listed opportunities. The below items are what we covered in our talk today. On 2-27-14 Josiah reviewed the SHRINK books and couldn't find one that was correct yet Jerrald had signed off on them. Many of Jerralds departments lack structure and still haven't created, or aren't following Opening & Closing procedures. The garden department continues to have trash, debris and product left throughout the entire department, while the SM's standard and company standard has always been Gran (sic) Opening ready on a daily basis. Lumber department continues to run out of key SKU's of top sellers even after the standard has been set here as well. Trash and debris are left in this department on a regular basis as well and aisles continue to be clogged with freight. Out of stocks continue to not be a weekly focus, while its one of the BIG 3. Also Training continues to go overdue in Jerralds departments- while nothing should ever be overdue because the district standard for the las (sic) 8 months is for all associates to stay 1 full month ahead on training classes in Knowledge Depot.

Mr. Cocke issued Plaintiff his annual evaluation on March 27, 2014. (Exhibit A, p. 69, Exhibit 3 thereto). This evaluation covered Plaintiff's performance from when he started working for Home Depot in May of 2013 through January of 2014. (*Id.*) The evaluation contained positive comments, but also noted some developmental needs for Plaintiff and noted that Plaintiff needed to continue to work on his communication style with associates. (*Id.*) For example, the evaluation noted that "Jerrald will need to continue to grow his relationship with his peers, better the lines of communication and continue to grow himself with the details of HD processes…" (*Id.*) The evaluation noted that Plaintiff needed to "[a]nalyze any communication problems you encounter; determine what went wrong, why & how; work to find effective solutions.." (*Id.*)

Thereafter, Mr. Cocke submitted several more manager's notes regarding Plaintiff. (Exhibit B, ¶ 6, Exhibit 1 thereto). Those manager's notes stated the following:

- 5/9/14: On Tuesday 5-6-13 I stopped in the store at 4PM to find the entire store out of order. There were no buggies for our shoppers, the lumber aisles were totally empty and the lumber canopy was full of debris, trash, trip hazards, as well as product un-shoppable for our customers. I ask around with my team and found that Jerrald had left the store at 1PM on this day. Jerrald and I had talked about him leaving an hour early and this would have had him leaving at 3PM (he was scheduled until 4, but a personal appointment and he needed to leave at 3. I approved the 3 PM departure, not a 1 PM departure. I immediately shot a text to my ASM's stating that their scheduleds (sic) must be worked 100% to compliance or I must be in the loop well before hand. Today is 5-9-15 and it's 1:40 and Jerrald was scheduled for a 1-12 shift today. I feel that he is not working his schedule or scheduled hours. Both of these days were spot checks (where I wasn't scheduled). On top of this issue - I gave the ASM's until today to have all their training in their departments with zero overdue - Jerrald has missed this goal as well.

- 5/29/14: Jerrald is doing much better with his personal skills. Jerrals (sic) is on the floor working with his team and setting better expectations and doing better follow up. The results are showing in the overall store appearance and in his departments sales. While we (2903) or Jerrald isn't where I would like for them to be - Nobody is without growth opportunity, nor will anyone ever be without opportunity. I can see a difference in Jerralds (sic) traction, attitude, communication and results. We are moving in the right direction and he is very receptive to feedback and he cares about working on his areas of opportunity

- 7/24/14: On 7-22-14 I had all 3 ASM's to my office for a discussion about things that concerned me. I let the team know that I was proud of how far we've come over the last year. That being said I explained to them that I would not allow us to continue to fail in basic areas that I've coached and trained on over 10 - 20 times. I explained that letting buy back expire, Not filling out the water log, sweep log, ISAL Execution, Key Category Mark downs, On Line VOC below the company goal, Store VOC below goals, Store Standards not being followed, In Stock level over 125 OOS, Pack Downs Over Due, IOW's not being worked, Clearance Reports not being worked by DH's every week, Overhead organization & Striping, Receiving being emptied every night, Specialty Tracking Board being filled out daily, Overtime being cut before weekends, SRC and safety issues being identified and addressed, ZMA being done 3 times a day are just a few of the issues we discussed on Tuesday. I made it very clear that we had covered these areas on numerous occasions with the entire team and that I would no longer accept failure here. I explained to them that they are not setting their standard with their teams and that it shouldn't take the Store Manager to address these areas, because I've already addressed them with my direct reports on at least 10 or 20 different times. I explained to them that it was their job to manage these things for me and that I wasn't comfortable with their lack of engagement in these areas. I ask each

of them how I could help and what exactly was going on with the lack of traction. Each of them said that I was correct and that I had done all the coaching and training in these areas and that they would get it corrected and keep it corrected. I explained to them that I was proud of each of them, but as their SM - I would no longer accept failure in areas that I've been very clear on the expectations and areas that I've done the training on.

Plaintiff switched positions from the Merchandising ASM to the Specialty ASM in August of 2014. (Exhibit A, pp. 28-29). The Specialty ASM oversees the flooring, kitchen and bath, millwork and plumbing departments. (Exhibit A, p. 42). Mr. Cocke remained the Store Manager, and continued to observe issues with Plaintiff's performance. For example, Mr. Cocke submitted the following Manager's Notes regarding Plaintiff after Plaintiff became the Specialty ASM:

- 10/3/14: This morning I walked the D-70 ad set that I covered in detail (word for word) on Specialty Tuesday. I was very clear of how important it was to follow this Ad Set Playbook without flaw. The ad was to be set befor (sic) departure on Wednesday night and the promos broke on Thursday morning. Upon arriving this morning (Friday), I walked the showroom and found that only about 10% of the Play Book had been executed. This tells me that we missed an entire day of providing our customers these great deals and lost sales for the store. Jerrald worked a full shift yesterday and should have verified his team executed to the standard of the expectation that I ask for (I ask for them to follow the company play book). Jerrald also had to be reminded to up date his Lead/Measure board for a new month (October). Jerrald no doubt has the ability to succeed but he continues to require continual follow up to ensure things are executed correctly or even executed at all. I've covered these areas of opportunity with Jerrald and I hope to see a change for the better

- 12/4/14: Had a talk with the ASM's today about setting the perimeter within an hour of closing the store. I also addressed the ZMA being done 3 times a day in its entirety. I was very clear that infractions in these 2 areas would be zero tolerance and would be an immediate write up going forward.

(Exhibit B, ¶ 6, Exhibit 1 thereto).

On January 2, 2015, Mr. Cocke issued Plaintiff a written coaching for Plaintiff's failure to follow instructions and perform his job duties. (Exhibit A, p. 78, Exhibit 4 thereto). Specifically, in a strongly worded written coaching, Mr. Cocke noted that Plaintiff had failed to

follow his instructions in several different areas, including store appearance, in stock, customer service and store standards. (*Id.*) This included incorrectly priced appliance and promotional signage in Plaintiff's departments, which caused Home Depot to offer those reduced prices to customers. (*Id.*) It also included Plaintiff's failure to conduct interviews for new associates during a two week period, which caused continued staffing issues and stressed associates. (*Id.*) The coaching required Plaintiff to come into compliance quickly. (*Id.*)

After Mr. Cocke issued this written counseling to Plaintiff, Mr. Cocke submitted a Manager's Note on January 5, 2015, noting that "[d]uring our coaching on Friday 1-2-15 Jerrald was very disrespectful and insubordinate. I've already written my statement and I'm partnering with AACG today & I have a witness statement from another SM who was in the room at the time." (Exhibit B, ¶ 6, Exhibit 1 thereto).

Thereafter, the AACG conducted an investigation into Mr. Cocke's concerns. (Exhibit B, ¶ 8). The AACG collected statements from Mr. Cocke (oral), Reco Watson, who was Plaintiff's mentor and who witnessed the written coaching, and from Plaintiff. (Exhibit B, ¶ 8, Exhibit 2 thereto). The AACG's investigation confirmed that Plaintiff acted in an insubordinate and disrespectful manner towards his supervisor, Mr. Cocke, during the written coaching on January 5, 2015. (*Id.*) The AACG recommended that Plaintiff receive a written counseling for Plaintiff's minor violations of Home Depot's respect policy, which Mr. Cocke issued to Plaintiff. (Exhibit A, p. 91, Exhibit 5 thereto; Exhibit B, ¶ 9). The written counseling noted:

> On 1-2-15 Jerrald was given a Coaching on Performance write up on areas of opportunity in his specialty departments. During this Coaching, Jerrald had to leave the store in the middle of the coaching for what he said was to "Cool Down." Later that afternoon Jerrald was given the same Coaching and during this coaching session Jerrald was very disrespectful in his body language, words & behavior. Jerrald continued to claim that he had completed 3 interview packets, but he didn't have the completed

> packets, nor could he provide the names of who he interviewed. Both Respect & Integrity are expected of all members of HD payroll and should be upheld to the highest standards by salaried managers. Based on the Company's investigation, it has been determined that this conduct violated the Company's respect policy.
>
> Jerrald Simpson must work on his communication and delivery. Jerrald must work at being a servant leader to his team. Be more aware of how he comes across to the sales association, DH's, ASM's & his SM. Being respectful & honest core values that this company was built upon, should refrain from further violations of the Standards of Performance. Further infractions will result in additional disciplinary action up to and including termination of employment.

(Exhibit A, p. 91, Exhibit 5 thereto). In Plaintiff's deposition, he implied that Mr. Cocke might have thrown the interviews packets at issue in the trash. (Exhibit A, p. 93). However, in his statement to the AACG regarding Mr. Cocke's complaint, Plaintiff admitted it was likely that he, himself, threw the interview packets in the trash. (Exhibit B, ¶ 8, Exhibit 2 thereto)("Later I realized that I must have thrown the packets in the trash as I was cleaning out my filing cabinet after talking with my peers about how full my drawer was.")

Meanwhile, on January 6, 2015, while the AACG was conducting its investigation, Mr. Cocke submitted another Manager's Note on Plaintiff, noting that Plaintiff still had not ensured that promotional signs had been removed, as instructed. Specifically, Mr. Cocke noted:

> When walking the store on yesterday, I noticed that there were still promotional signs still up after the promos expired on 1-4-15. There were 10% counter top signs up in the kitchens area and on the race track. There were over 10 signs still left on the cabinet aisle saying 15% off all in stock cabinets. There was also a cabinet on the back race track with this 15% off signage as well. This is very concerning because - just 3 days ago I coached Jerald with a "Coaching" write up and this was one of the issues that was addressed. It is also concerning because Jerrald closed the store on the 4th and this was when the signage should have been removed. Jerrald is also the SASM and he should take ownership here. This

> has been an issue for over 6 months and this very issue continues
> to cause the store careless mark downs.

(Exhibit B, ¶ 6, Exhibit 1 thereto). Clearly, Mr. Cocke's continued efforts to coach and counsel Plaintiff were not having their intended effect. However, Mr. Cocke continued to attempt to work with Plaintiff.

On March 27, 2015, Mr. Cocke issued Plaintiff's annual evaluation. (Exhibit A, pp. 99-100, Exhibit 6 thereto). Once again, the detailed evaluation contained positive comments regarding Plaintiff's performance in certain areas. (*Id.*) The review noted that "Jerrald has a very high level grasp of business and his runway for growth is great but he must quickly better his communications skills and delivery with associates, DH's and peers. Jerrald must understand that people's perception is their reality and he needs to be very aware of how he may come across to other people." (*Id.*) In the "Key Development Needs" section, Mr. Cocke noted that Plaintiff was "not empowering and not a person many people want to work for, around or with," amongst some other key needs. (*Id.*) Plaintiff was scored as a "Valued Associate" that was "Well Positioned," but believed he should have been marked as a "Top Performer" despite all of the issues he had experienced in the nine months he had worked for Home Depot (May 2013-January 2014). (Exhibit A, pp. 103-104).

Thereafter, on April 10, 2014, Mr. Cocke submitted a Manager's Note on all of the ASM's in the store, which noted:

> On 4-9-15 at 6:30 AM I had an emergency staff meeting with my
> ASM's. During this meeting I explained to the salaried team that
> there were many areas of opportunity from Ad Set being done
> correctly, having a manager on the front race track to ensure lines
> were not forming and the lack of engagement from their DH's. I
> explained to them that their DH's were dropping the ball in many
> areas that I've set clear standards and expectations and that they
> have given me nothing to show that they are doing the same with
> their teams. I was very clear on this - If they don't get their teams
> & themselves more engaged that there would be accountability and

> it would fall on them. I told them that I felt the coaching and training had been done on my end with them. I also explained to them that there is a problem and I wasn't sure if the problem was the ASM salaried team or their DH's but that it must stop immediatly (sic)

(Exhibit B, ¶ 6, Exhibit 1 thereto).

On April 14, 2014, Mr. Cocke was required to issue another written counseling to Plaintiff for his continued performance issues. (Exhibit A, p. 106, Exhibit 7 thereto). This written counseling noted that once again, Plaintiff's departments had expired signage which required Home Depot to offer promotion pricing to customers even after the promotion had ended. (*Id.*) It further noted that on April 9, 2015, Mr. Cocke had personally asked Plaintiff to ensure that the pricing on two specific signs was corrected, but those signs had not been corrected by the next day. (*Id*). The counseling noted that Plaintiff needed to pay more attention to detail going forward. (*Id.*). Plaintiff testified that Mr. Cocke was "retaliating against me on every little thing I did," and testified he did not remember being told to correct certain signs by Mr. Cocke. (*Id.*). However, Plaintiff did not relate his allegation of retaliation to any protected characteristic. (*Id.*)

Plaintiff admitted that during his time under Mr. Cocke, he was never suspended (or terminated) or docked any pay. (Exhibit A, pp. 116-118). Plaintiff alleged that Mr. Cocke held him to a higher standard of performance in the Specialty area than the previous ASM, Kristie, who is Caucasian. (Exhibit A, pp. 120-121). However, Plaintiff testified that while he was with Home Depot, he never complained that he was discriminated against in any way, and struggled to give specific examples of how he was held to a higher standard than Kristie. (Exhibit A, pp. 54-55).

**B.     Plaintiff's Tenure Under Drew Gentry**

In May of 2015, Mr. Cocke transferred to another store, and Drew Gentry took over at Store Manager for the Horn Lake store. (Exhibit A, p. 46). During this time period, Joel Cogdell (African-American) was the District Manager who supervised Mr. Gentry. (Exhibit A, p. 48).

Mr. Gentry, like Mr. Cocke, submitted numerous Manager's Notes on Mr. Simpson, many of them having to do with Plaintiff's communication style with customers and associates. (Exhibit C, Declaration of Enoch Drew Gentry, ¶ 6, Exhibit 1 *in globo* thereto). During Mr. Gentry's time supervising Plaintiff, he submitted Manager's Notes on the following dates on the following topics:

- 8/12/15: Failing to enter a work order on a busted hydraulic line, causing unloading delays in receiving;

- 8/24/15: Missing sales goals and sales measures;

- 9/16/15: Lack of respect in interaction with associate;

- 12/11/15: Overdue work and missed deadlines;

- 12/16/15: Improper procedure on variances;

- 12/18/15: Overdue work and missed deadlines and assignments;

- 1/13/16: Retraining on shrink procedures for Plaintiff's departments;

- 1/15/16: Poor customer service for professional customer;

- 1/15/16: Lack of respect in interaction with associates and lack of time management;

- 1/15/16: Failure to hold associates accountable to their schedule;

- 1/19/16: Discussion with Plaintiff regarding town hall results regarding his leadership;

- 1/19/16: Lack of respect in interaction with associates;

- 1/19/16: Overdue work and missed deadlines, with reference to previous manager's note on 12/11/15;

- 1/21/16: Poor opening conditions for the store after Plaintiff was the manager on duty at close the night before;

- 1/29/16: Poor scores for associate interactions with Plaintiff on "Factor Cards;"

- 1/29/16: Failure to issue performance improvement plan to associate as directed.

(Exhibit C, Declaration of Enoch Drew Gentry, ¶ 6, Exhibit 1 *in globo* thereto). Plaintiff's interactions with associates clearly continued to be an issue, as well as his timeliness in completing assignments.

During that same time period, Plaintiff received a Final Warning in June of 2015 for a safety violation when he failed to ensure that a door was locked upon closing, leaving millions of dollars in inventory unsecured. (Exhibit A, pp. 128-129). Plaintiff received a Final Warning pursuant to Home Depot's progressive discipline policy, as he had previously received a written counseling in April of 2015. (Exhibit C, ¶ 7, Exhibit 2 thereto, Home Depot's Standards of Performance). Plaintiff was the manager on duty on the night at issue, at therefore, it was his responsibility to ensure that all doors were secured. (Exhibit A, p. 129). Plaintiff admitted that Mr. Gentry had issued a similar Final Warning to a Caucasian ASM around the same time for his failure to ensure that a door was locked upon closing. (Exhibit A, p. 131).

Although he could have been terminated for any other infractions, Plaintiff received another Final Warning in lieu of termination on September 29, 2015 from Mr. Gentry. (Exhibit A, pp. 133-134, Exhibit 8 thereto). Plaintiff received this Final Warning for failing to follow-up with a customer on some damaged items that the customer had purchased online and picked up at the store. (*Id.*) The Final Warning also covered some other customer service issues experienced

by Plaintiff. (*Id.*) Plaintiff blamed his customer service failures on the store being "chaotic" and everyone being on break at the time. (Exhibit A, p. 134). As noted, this was another Final Warning, meaning Mr. Gentry issued Plaintiff two Final Warnings instead of terminating him on the second occasion. Thus, any other policy violation could lead to his termination, pursuant to Home Depot's progressive discipline policy.

This is exactly what happened in December of 2015. Specifically, on December 9, 2015, Plaintiff was the manager on duty at the Horn Lake store. (Exhibit A, pp. 144). Plaintiff left the office at the store to investigate a potential shoplifting situation in the garden department. (Exhibit A, p. 144). In doing so, he instructed Patricia Lundebo (then Patricia Hardy), an hourly, key-carrying associate, to accompany him. (*Id.*) Mr. Simpson and Ms. Lundebo walked through the garden department, and noticed the customers at issue were in the parking lot with two other Home Depot hourly associates who were assisting with loading. (Exhibit D, Deposition of Patricia Lundebo, p. 7). Plaintiff instructed Ms. Lundebo to follow him to the parking lot where the customers and the associates were loading lumber. (Exhibit A, p. 145; Exhibit D, p. 7). Upon arrival, Plaintiff asked the customers for a receipt for the lumber. (Exhibit A, p. 146; Exhibit E, p. 7). Plaintiff then asked the customers to pull their truck to the pro area where customers usually load lumber. (Exhibit A, p. 146). Plaintiff testified he was concerned the customer might be reaching for a weapon. (Exhibit A, p. 146). When the customers started to pull towards the pro area, Plaintiff tried to follow close behind them to meet them at the pro area. (Exhibit A, p. 147). The customer then veered off into the parking lot and began to drive off. (Exhibit A, pp. 147-148). Ms. Lundebo testified that Mr. Simpson instructed her to call the police. (Exhibit D, p. 8). Ms. Lundebo submitted a statement verifying the same. (Exhibit E, Deposition of Enoch Drew Gentry, p. 28, Exhibit 25 thereto). Jeffrey Denhart, one of the associates assisting with

loading the lumber, verified this as well when he was interviewed by the AACG. (*Id.*) Plaintiff testified that Ms. Lundebo called the police on her own volition. (Exhibit A, p. 148). The police showed up at the store around fifteen minutes after the incident. (Exhibit A, p. 148).

Thereafter, Mr. Gentry, who was not at the store at the time, reported back to the store to gather information on the incident. (Exhibit E, p. 22). Mr. Gentry testified that according to Home Depot policy, employees are not allowed to contact the police in non-emergency situations without prior approval from the Store Manager. (Exhibit C, ¶ 7, Exhibit 2 thereto, Home Depot's Standard Operating Procedures; Exhibit, p. E, p. 23). Mr. Gentry learned that Patricia Lundebo had contacted the police at the instruction of Plaintiff. (Exhibit E, pp. 24-25). Thereafter, Mr. Gentry contacted the AACG and the asset protection manager in the district to inform them of the situation. (Exhibit E, p. 25). The AACG conducted an investigation into the incident. (Exhibit E, p. 26). In doing so, the AACG collected statements, including statements from Plaintiff and Ms. Lundebo. (Exhibit E p. 27). In addition, Mr. Gentry testified that Plaintiff gave him three different renditions of what occurred regarding the incident at issue. (Exhibit E, pp. 31-32).

Ultimately, after its independent investigation, the AACG issued a recommendation of discipline regarding the incident. (Exhibit E, p. 39, Exhibit 25 thereto). The AACG, through its investigation, substantiated that Plaintiff had conducted or attempted to conduct a receipt check outside of the store, which was a minor work rules violation of Asset Protection because only authorized individuals can do so.(Exhibit E, Exhibit 25 thereto). The AACG also substantiated a minor violation of the Asset Protection rules because of Plaintiff's instruction to contact the police in a non-emergency theft situation without first partnering with asset protection. (*Id.*) Both of these actions are explicitly prohibited by Home Depot's Standards of Performance. (Exhibit

C, ¶ 7, Exhibit 2 thereto). Because Plaintiff had an active Final Warning on file, the AACG recommended termination, which was the next step. (Exhibit E, Exhibit 25 thereto). The AACG also recommended discipline for the two associates in the parking lot with the customers. (*Id.*) Neither had an active Final Warning like Plaintiff. (*Id.*) The AACG sent this recommendation to Mr. Gentry and Mr. Turner. (Exhibit E, p. 40). Thereafter, Mr. Gentry and Mr. Turner partnered with Mr. Cogdell (African-American), the District Manager at the time, as well as Belinda Thomas (African-American), the Regional Associate Relations Manager, and Layne Thome (Caucasian), the Regional Human Resources Director, and decided to terminate Plaintiff's employment pursuant to the AACG investigation and recommendation. (Exhibit E, p. 40; Exhibit F, Declaration of Belinda Thomas, ¶¶ 6-9, Exhibit 1 thereto). Mr. Gentry them terminated Plaintiff's employment. (*Id.*) Around the same time, Mr. Gentry terminated another ASM, Ronnie Dinolfo (Caucasian) for policy violations. (Exhibit A, p. 157). Thereafter, Mr. Gentry replaced Plaintiff and Mr. Dinolfo with two ASM's, one who is African-American and one who is Caucasian. (Exhibit C, ¶ 8).

Plaintiff alleged in his deposition that an African-American hourly associate, Sharieka "Shay" Wilson, once told Plaintiff about a text message she allegedly saw from Mr. Gentry to another hourly associate, Tracey Parnell. Plaintiff alleged that according to Ms. Wilson, the text message from Mr. Gentry to Ms. Parnell read that "they ought to just let me fire his black ass" in reference to Mr. Simpson. (Exhibit A, pp. 122-124). Plaintiff admitted that he never saw this alleged text message, but alleged that Shay Wilson saw the text message in Ms. Parnell's cellular phone. (Exhibit A, pp. 122-124). Ms. Wilson testified that she witnessed a text message in Ms. Parnell's cellular phone from Mr. Gentry that Ms. Parnell should not worry because Mr. Gentry would be firing Plaintiff's "black ass." (Exhibit G, p. 15). Ms. Wilson could not identify when

she saw this alleged text message. (Exhibit G, p. 16). Ms. Wilson testified that "[i]t was two years ago. I can't remember the time or the date." (Exhibit G, p. 17). Ms. Wilson also admitted that she did not report this alleged text message to anyone at Home Depot. (Exhibit G, p. 31). Ms. Wilson also stated she did not have a copy or a picture of the text message. (Exhibit G, p. 32). The text message at issue is rank hearsay and is not competent summary judgment evidence. In addition, Ms. Parnell denies that Mr. Gentry ever sent her such a text message or that she ever showed Ms. Wilson such a text message. (Exhibit H, Declaration of Tracy Parnell, ¶¶ 4-9).

## IV.    LAW AND ARGUMENT

### A.    Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In determining whether the movant is entitled to summary judgment, the court views the facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.  The party seeking summary judgment bears the burden of demonstrating an absence of evidence to support the non-movant's case.  If the movant correctly points to an absence of evidence to support the plaintiff's claim on an issue as to which the plaintiff would bear the burden of proof at trial, then summary judgment should be granted to the movant, unless the non-movant can produce summary-judgment evidence sufficient to sustain a finding in plaintiff's favor on that issue. *Kovacic v. Villareal*, 628 F.3d 209, 212 (5th Cir. 2010).  Only evidence that is competent, or admissible, may be used to support or oppose summary judgment. *Read v. Brown*, 72 Fed. Appx. 112, 118 (5th Cir 2003), *cert. denied*, 540 U.S. 1180 (2004).  The absence of evidence on an element of a claim upon which the non-movant has the burden of proof is fatal to that claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A plaintiff's own self-serving,

conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the non-movant's burden of proving discrimination. *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012). Under these standards, Home Depot is entitled to summary judgment in Plaintiff's claims.

**B.      Home Depot Is Entitled to Summary Judgment on Plaintiff's Discrimination Claim**

Without any direct evidence of discrimination, the burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1917, 36 L. Ed. 2d 668 (1973), and its progeny applies.[3] In employment discrimination cases, the "plaintiff bears the initial burden to prove a *prima facie* case of discrimination by a preponderance of the evidence." *Id.* at 802. A plaintiff must prove a *prima facie* case of race discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for the employment position at issue; (3) he suffered an adverse employment action; and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances, or he was replaced by someone outside of the protected class. *Edwards v. Senatobia Municipal School District*, 2013 WL 12123936, *1 (N.D. Miss. 5/21/13) (Mills, M.), citing *Meinecke v. H&R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 1995); *Howard v. Mississippi State University*, 2015 WL 1862923, *6 (N.D. Miss. April 23, 2015) (Mills, M.), citing *Lee v. Kan. City S. Ry.*, 574 F.3d 253, 259 (5th Cir. 2009). To survive summary judgment on a claim of unlawful employment discrimination, a plaintiff must prove that there is a genuine dispute of material fact concerning his *prima facie*

---

[3] The elements of a racial discrimination are the same, whether the claim is asserted under Section 1981 or Title VII. *See Riley v. Sch. Bd. Union Parish*, 379 Fed.Appx. 335, 229 (5th Cir.2010) (citing *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316, 319 (5th Cir.2004)); *Lockett v. Wal–Mart Stores, Inc*., 337 F.Supp.2d 887, 891 (5th Cir. 2004).

case. *McDonnell Douglas*, 411 U.S. at 793. Because Plaintiff cannot meet his burden with respect to the fourth element of his *prima facie* case, his race discrimination claims under Title VII and 42 U.S.C. § 1981 fail.

1. **The Racial Makeup of the Assistant Store Managers Stayed the Same After the Termination of Plaintiff and Mr. Dinolfo**

As explained above, Plaintiff, who is African-American, and Ronnie Dinolfo, who is Caucasian, were terminated as ASM's from the Horn Lake store around the same time. (Exhibit A, p. 157). They were replaced by Robert Bigelow (Caucasian) and Anthony Lockhart (African-American). (Exhibit E, p. 17). While Mr. Bigelow was technically Plaintiff's replacement, the hiring of Mr. Bigelow and Mr. Lockhart to replace Plaintiff and Mr. Dinolfo shows that race had absolutely nothing to do with Plaintiff's termination. Therefore, Plaintiff cannot establish a prima facie case of discrimination under this prong.

2. **Plaintiff cannot show that a similarly situated employee outside of his protected class was treated more favorably under nearly identical circumstances**

Plaintiff must attempt to show that he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class. Plaintiff cannot do so. In fact, as just mentioned, Ronnie Dinolfo, who is Caucasian and was an ASM in the Horn Lake store, was terminated around the same time as Plaintiff for similar violations. In fact, Mr. Dinolfo was issued a Final Warning for failing to secure an exit door at the store before closing, or the exact same reason Mr. Simpson received his first Final Warning. (Exhibit A, p. 131).

Plaintiff may allege that the other associates involved in the shoplifting incident which led to Plaintiff's termination were not terminated and therefore were treated better. This argument should fail. First, those employees are not similarly situated to Plaintiff. "In disparate

treatment cases, the plaintiff-employee must show 'nearly identical' circumstances for employees to be considered similarly situated." *Berquist v. Washington Mutual Bank*, 500 F.3d 344, 353 (5th Cir. 2007). "The Fifth Circuit has consistently found that employees with different responsibilities, different supervisor, different capabilities, <u>different work rule violations, or different disciplinary records</u> are not considered 'nearly identical.'" *Id*. (citation omitted). In this situation, Plaintiff was a salaried member of management, while the other employees were hourly associates. In addition, they had different disciplinary records, as there is no evidence in the record that any of the other employees involved were on active final warnings under Home Depot's progressive discipline policy. Therefore, Plaintiff cannot establish a *prima facie* case of discrimination, and Home Depot's Motion for Summary Judgment should be granted.

**C.    Home Depot Has a Legitimate, Nondiscriminatory Reason for Plaintiff's Discharge.**

Even if Plaintiff could establish a *prima facie* case, which he cannot do, his claim still fails. Once the plaintiff establishes a *prima facie* case, and only if he does so, "[t]he burden of <u>production</u> then shifts to the defendant to <u>articulate</u> a legitimate, nondiscriminatory reason for the challenged employment action." *McDonnell Douglas Corp.*, 411 U.S. at 802. The employer need not "disprove" the plaintiff's *prima facie* case or even "prove" the absence of a discriminatory motive. *Bd. of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 n. 2, 99 S. Ct. 295, 58 L. Ed. 2d 216 (1978).

As outlined in detail above, Plaintiff, who was on a second Final Warning at the time, was terminated for a violation of Home Depot's asset protection rules pursuant to Home Depot's progressive discipline policy. In fact, as outlined above, Plaintiff had been issued two final warnings, both of which were active at the time of his termination. While Plaintiff may allege that the AACG's investigation came to an incorrect conclusion, "[e]ven an incorrect belief that

an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason."

*Murphree v. Potter*, 226 F. Supp. 2d 826, 836 (N.D. Miss. 2002)

> **D.** **Plaintiff Does Not Have Any Evidence of Pretext.**

If the defendant presents a nondiscriminatory reason, the presumption of discrimination ceases, and the plaintiff must offer sufficient evidence to create a genuine issue of material fact that the defendant's reason is not true, but is instead a pretext for discrimination. *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). The ultimate burden of persuasion remains with the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

In light of this, Plaintiff's "assertion of pretext must rest upon sufficiently specific, substantive reasons beyond self-serving, subjective or speculative allegations." *Murphree*, 226 F. Supp. 2d at 835. Even if he sincerely believed that his termination was discriminatory (which would not be a reasonable belief), the Fifth Circuit has explained that "a subjective belief of discrimination, however genuine [may not] be the basis of judicial relief." *Lawrence v. Univ. of Texas Med. Branch of Galveston*, 163 F.3d 309, 313 (5th Cir. 1999). Plaintiff cannot simply disagree with the legitimate, nondiscriminatory reason articulated by Home Depot. *Murphree*, 226 F. Supp. 2d at 836 ("What [plaintiff] fails to realize is that 'merely disputing [an employer's] assessment of a [plaintiff's] work performance will not necessarily support an inference of pretext.'"), citing *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001) (quoting *Shackelford v. DeLoitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999)).

> **a.** **The Business Judgment Rule Weighs Against Pretext.**

Home Depot has thoroughly shown that Plaintiff could not satisfactorily perform the job. Plaintiff's performance issues are numerous and well-documented. Regardless of this showing,

the business judgment rule shuts the door on Plaintiff's case. "In analyzing issues like this one, the Court must be careful not to allow Title VII [and § 1981] plaintiff simply to litigate whether they are, in fact, good employees." *Scott v. J.E. Merit Constructors, Inc.*, 2012 U.S. Dist. LEXIS 67970, *24 (M.D. La. May 15, 2012) (internal quotations omitted), citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). So, whether Plaintiff believed he was a good employee does not matter for purposes of pretext. The question to be resolved is not the wisdom or accuracy of the decision or whether it was "prudent or fair" to discharge plaintiff. *Id.* at *25. "Instead, the Court's sole concern is whether unlawful discriminatory animus motivated the decision." *Id.* (internal quotations omitted), citing *Rojas*, 285 F.3d at 1342. Thus, the fact that Plaintiff may believe he was a well-performing employee is not evidence of pretext. "For, 'while an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply **whether the given reason was a pretext for illegal discrimination**.'" *Murphree*, 226 F. Supp. 2d at 836 (emphasis added), citing *Nix v. WLCY Radio/Rahall Communs.*, 738 F.2d 1181, 1187 (11th Cir. 1984) (citing *Megill v. Board of Regents*, 541 F.2d 1073, 1077 (5th Cir. 1976)). As the Fifth Circuit has explained:

> Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue .... [A] dispute in the evidence concerning job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence.

*Id.*, citing *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995). "Moreover, federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'" *Baynes v. W. R. Grace & Co.-Conn.*, 2009 U.S. Dist. LEXIS 77264, *24-25 (W.D. La. Aug. 27, 2009); *see also Murphree*, 226 F. Supp. 2d at 837 (declining plaintiff's invitation to sit as a "super-personnel department") (citation omitted).

Plaintiff has no evidence that Home Depot's reasons for terminating his employment were pretextual. Home Depot simply followed its progressive discipline policy, which in normal situations, requires a coaching, counseling, Final Warning and then termination. (Exhibit C, ¶ 7, Exhibit 2 thereto). Plaintiff was coached on January 2, 2015, for Plaintiff's failure to follow instructions and perform his job duties. (Exhibit A, p. 78, Exhibit 4 thereto). Plaintiff was counseled on April 14, 2014, for his continued performance issues. (Exhibit A, p. 106, Exhibit 7 thereto). Plaintiff was issued a Final Warning in June of 2015 for a safety violation when he failed to ensure that a door was locked upon closing, leaving millions of dollars in inventory unsecured. (Exhibit A, pp. 128-129). Plaintiff was given the benefit of the doubt and received **another** Final Warning on September 29, 2015 from Mr. Gentry. (Exhibit A, pp. 133-134, Exhibit 8 thereto). Plaintiff received this Final Warning for failing to follow-up with a customer on some damaged items that the customer had purchased online and picked up at the store. (*Id.*) The Final Warning also covered some other customer service issues experienced by Plaintiff. (*Id.*) Finally, as outlined above, the AACG found that Plaintiff violated its asset protection policy in December of 2015, and recommended that the next step in the progressive discipline policy, termination, be taken. Drew Gentry (Store Manager- Caucasian), Joel Cogdell (District Manager- African American), James Turner (District Human Resources Manager- Caucasian), Belinda Thomas (Regional Associate Relations- Director), and Layne Thome (Regional Human Recourses Director- Caucasian), reviewed the AACG's recommendation, and decided to implement it. Plaintiff has no evidence at all that Home Depot's decision to terminate him was in any way related to his race. Plaintiff cannot show pretext by questioning the wisdom of the termination decision. *Bourgeois v. LBC of Baton Rouge, LLC*, 2014 U.S. Dist. LEXIS 116128, *14 (M.D. La. Aug. 20, 2014). "Fifth Circuit law is well-settled that 'discrimination laws [are

not] vehicles for judicial second-guessing of business decisions.'" *Id.*, citing *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 (5th Cir. 1997). Similarly, discrimination statutes are not "intended to transform the courts into personnel managers." *Vallee v. Hummer-Saab, LLC*, 2013 U.S. Dist. LEXIS 46962, *17 (M.D. La. March 28, 2013) (citation omitted). It is improper for a court to put itself in the position of the employer and second-guess its job performance requirements. *Id.* at *17-19. And, the issue is not whether the employer made an error in terminating the plaintiff, but whether the plaintiff's termination was prompted by discriminatory animus. *Id.* at *19, citing *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1091 (5th Cir. 1995) (stating that "the question is not whether an employer made an erroneous decision; it is whether the decision was made with a discriminatory animus"); *Jones*, 212 Fed. Appx. at 275 (holding that "Title VII does not protect an employee against unfair employment decisions; instead, it protects against employment decisions based on discriminatory animus") (citation omitted).

Because Plaintiff cannot show that Home Depot's legitimate, non-discriminatory reason for his termination was pretextual, the Court should grant Home Depot's Summary Judgment.

## V.    CONCLUSION

The evidence (or lack thereof) in this case is clear. Plaintiff simply has no evidence that his termination had anything to do with his race. Therefore, Home Depot's Motion for Summary Judgment should be granted.

HOME DEPOT U.S.A., INC.
BY ITS ATTORNEYS,

Lindsay Thomas Dowdle (MS #102873)
Jones Walker LLP
190 E. Capitol Street, Ste. 800
Jackson, MS 39201
Email:  ldowdle@joneswalker.com

Of Counsel:

*/s/ David K. Theard*
Jennifer F. Kogos (LA #25668)
*Pro Hac Vice*
David K. Theard (LA # 31987)
*Pro Hac Vice*
Jones Walker LLP
201 St. Charles Avenue, 47th Floor
New Orleans, Louisiana 70170-5100

## CERTIFICATE OF SERVICE

I certify that on November 30, 2017, counsel for Home Depot filed the above and foregoing **Memorandum in Support of Motion for Summary Judgment** with the Clerk of Court utilizing the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ David K. Theard*
David K. Theard