**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

JERRALD SIMPSON                                                                    PLAINTIFF

VS.                                                        CAUSE NO. 3:17-CV-00007-MPM-JMV

HOME DEPOT U.S.A., INC.                                                         DEFENDANT

**PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Jerrald Simpson ("Simpson" or "Plaintiff"), by and through counsel, and files this Memorandum Brief in Opposition to the Motion for Summary Judgment [Docket 36] filed by Defendant, Home Depot U.S.A., Inc.("Home Depot" or "Defendant"), and in support thereof would respectfully show unto the Court as follows:

## FACTS

Stating the facts in the light most favorable to the non-movant, Plaintiff, and with all reasonable inferences drawn in his favor as required by *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), *Moore v. Willis Independent School Dist.*, 233 F.3d 871, 874 (5th Cir. 2000), and *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005), the relevant facts are as follows:

**1.      Background**

Jerrald Simpson, black, was born in Greenville, Mississippi, and graduated from Greenville High School in 1987. [Exhibit "1", Simpson depo., pp. 7, 12]  In 1992, Simpson received a bachelor of science in business administration from Mississippi Valley State University.  [Exhibit "1", Simpson depo., p. 14]

Starting in 1992, Simpson worked for Wal-Mart for twenty (20) years, working his way up to being a co-operation Store Manager.  [Exhibit "1", Simpson depo., p. 16]

### 2.  Hired at Home Depot

On May 6, 2013, Simpson was hired at Home Depot as an assistant store manager ("ASM") at the Horn Lake, Mississippi store, over merchandising.  [Exhibit "1", Simpson depo., pp. 19-20, 22, 27; Exhibit "2", Job Description] Josiah Cocke, white, was the store manager.  [Exhibit "1", Simpson depo., pp. 19, 25] As the merchandising ASM, Simpson was over the Lumber, Hardware, Electrical, Garden and Paint departments.  [Exhibit "1", Simpson depo., p. 27]

### 3.  First Year

In September 2013, Simpson received his mid-year evaluation, and it was generally positive, including:

> Jerrald has hit the ground running at 2903 [Horn Lake Home Depot].  Being new to the company he has quickly grasped the basics and continues to grow himself and his team daily.

[Exhibit "3", Mid-Year Check-in dated September 6, 2013]

In January 2014, Simpson received a good yearly evaluation, which rated him as a "Valued Associate . . . Well Positioned." [Exhibit "1", Simpson depo., p. 71; Exhibit "4", Evaluation for year 2013]  In the evaluation it states:

> Jerrald is a high level thinker who grasp[s] HD's business concept very quickly . . . Jerrald actively gets involved with his team in the aisles and sets clear expectations and leaves detailed work list[s] for his team.  Jerrald has shown time & time again that he is a true team player who is willing to put in the effort and time to make 2903 [Horn Lake Home Depot] a success.

[Exhibit "4", Evaluation for year 2013]

### 4.  Josiah Cocke is Accused of Racism

Prior to Simpson arriving at Horn Lake, department head Renea Batemen filed an Equal Employment Opportunity Commission ("EEOC") charge against Cocke, because of the racial atmosphere in the store.  [Exhibit "1", Simpson depo., pp. 49-51] Josiah Cocke told loss prevention

manager, Adam Ammar, that Simpson was brought in to the Horn Lake store because of his race. [Exhibit "5", Ammar depo., pp. 12-17] Horn Lake needed a black ASM according to the district human resources ("HR") manager, James Turner, because it did not have one, and it had just had an EEOC charge of race discrimination filed against it by Bateman. [Exhibit "5", Ammar depo., pp. 12-17]

Not surprisingly, Cocke seemed concerned that he was perceived as being a racist after the EEOC charge was filed. [Exhibit "1", Simpson depo., pp. 118-19] Cocke told Simpson, "That he grew up in black neighborhoods and he's one of the blackest white guys you will be able to see. He enjoys rap music and all that..." [Exhibit "1", Simpson depo., p. 120]

At first, when Simpson worked under Josiah Cocke, Simpson believed he had a good relationship with him. [Exhibit "1", Simpson depo., p. 28] However, at some point, the relationship deteriorated. [Exhibit "1", Simpson depo., p. 28] Other black employees expressed their issues to Simpson as well, but he did not want to believe them. [Exhibit "1", Simpson depo., pp. 53-54] Simpson was also concerned about the repercussions that would occur if he complained about being treated differently because of his race. [Exhibit "1", Simpson depo., p. 54]

### 5. Transferred to Speciality

Around August 2014, Simpson was transferred to be the ASM over speciality. [Exhibit "1", Simpson depo., p. 29] Specialty has four (4) departments: Flooring, Kitchen and Bath, Millwork, and Plumbing. [Exhibit "1", Simpson depo., p. 42]

Simpson was transferred because the merchandising departments were thriving financially, but the speciality departments were not. [Exhibit "1", Simpson depo., p. 29] Speciality was struggling with procedures, accountability, appearance, and service, as Simpson testified, "The area was a mess." [Exhibit "1", Simpson depo., pp. 29-30] Simpson asked that the speciality ASM,

Kristie Flitsch, white, to stay over speciality another month before making the move, so the area could be cleaned up first. [Exhibit "1", Simpson depo., p. 33] Also, Simpson's background was in merchandising, so he had a lot to learn in this new position. [Exhibit "1", Simpson depo., pp. 31] Simpson asked to be allowed to train with a speciality manager at another store, but this reasonable request was denied. [Exhibit "1", Simpson depo., p. 40]

### 6.    Simpson's Management Style

Simpson is very meticulous and detail oriented in his work. [Exhibit "1", Simpson depo., p. 35] Simpson would tour his area, document what needed to be done, and provide detailed notes and completion dates to his department heads. [Exhibit "1", Simpson depo., p. 35]

Sharieka "Shay" Wilson, black, worked at Home Depot in Horn Lake for approximately four (4) years, until November 2016. [Exhibit "6", Wilson depo., pp. 6-8, 18] Wilson started out as an associate, and was a department head the last year and a half she worked there. [Exhibit "6", Wilson depo., pp. 6-8] According to Wilson, "Jerrald was a manager who liked detail. He wanted to make sure everything was flowing . . . all of his ducks in a row and associates were all on the same page with what we were to do throughout the day..." [Exhibit "6", Wilson depo., p. 10]

Rodney McCraney, black, worked for Home Depot for approximately seven (7) years, until April 2017. [Exhibit "7", McCraney depo., pp. 6-8, 10] McCraney worked as a department head over several departments during his tenure at Home Depot, and left because he felt he had peaked as far as advancing with the company. [Exhibit "7", McCraney depo., pp. 8-9] McCraney described Simpson's management style as, "Very direct . . . He held all of his DHs ("department heads") to a certain standard . . . but he did train and coach you and made sure you knew exactly what he expected . . . Very detailed oriented . . . Very fair." [Exhibit "7", McCraney depo., pp. 8-9]

-4-

### 7. Simpson Tried to Get Speciality Organized

Simpson's management style did not go over well with some of the department heads who were more accustomed to Flitsch's relaxed style. [Exhibit "1", Simpson depo., pp. 31, 35-36] Simpson held meetings with his subordinates, where he tried to explain his expectations, and what he wanted done to get the speciality departments up to par. [Exhibit "1", Simpson depo., p. 38] It was common for Simpson to receive resistence to his efforts to improve the division, and some of his subordinates made complaints to the Associate Advice and Counsel Group ("AACG") against him. [Exhibit "1", Simpson depo., p. 45] Further, anytime that Simpson would correct one of his subordinates, they would go to Cocke, and he would undermine Simpson's authority. [Exhibit "1", Simpson depo., p. 81]

### 8. Simpson Receives First Coaching[1]

On January 2, 2015, almost two (2) years after he was hired at the Horn Lake store, Simpson received his first coaching. [Exhibit "8", Progressive Disciplinary Notice dated January 2, 2015] Simpson was allowed to coach his black department heads, but not his white department heads, especially, Tommy Lee. [Exhibit "1", Simpson depo., pp. 83-86] Much of the issues brought up in the coaching were deficiencies in Tommy Lee's department. [Exhibit "1", Simpson depo., pp. 86-

---

[1]In its summary judgment brief, Defendant points to manager notes that Cocke put in Simpson's file the first couple years, falsely trying to show that Simpson was not a good manager. Ronnie Dinolfo testified that managers are forced to put negative things in their subordinates' files by the district manager and HR managers, ". . . they tell us . . . Regardless of how good you are . . . you're forced to put something negative in their file." [Exhibit "9", Dinolfo depo., p. 40] Dinolfo had been specifically told himself to put negative things in his subordinates' files. [Exhibit "9", Dinolfo depo., p. 42] This was standard operating procedure for Home Depot; when they decide they want to terminate an employee, they target that employee with write ups and documentation in the employees file, so they can claim the employee is not doing his/her job. [Exhibit "9", Dinolfo depo., pp. 88-99]

89] Further, Cocke held Simpson to a higher performance standard than the white ASMs like Flitsch. [Exhibit "1", Simpson depo., p. 95]

**9. Incident with Josiah Cocke**

On or about January 2, 2015, Simpson opened up the store, and approximately thirty (30) minutes later, Cocke arrived and called him to his office. [Exhibit "1", Simpson depo., pp. 55-56] Cocke was upset about something, and was making wild hand gestures. [Exhibit "1", Simpson depo., p. 56] Simpson asked to take a break, because he was not able to absorb what was going on, as he explained, "Why don't we take a break so you can calm down..." [Exhibit "1", Simpson depo., pp. 56, 98] This made Cocke more upset, and he started cursing and became even more erratic, "No . . . we're not going no fucking where. We're sitting right here and we're going to deal with this right here right now." [Exhibit "1", Simpson depo., p. 57]

Simpson complained to the district manager, Joel Cogdell, and the district HR manager, James Turner, about his treatment by Cocke. [Exhibit "1", Simpson depo., p. 58] This turned out to be a mistake, as Cocke then became retaliatory:

> He said that "You think that was a smart move by calling the District Office?" And then he told me . . . "You don't know . . . I paint targets on peoples' back[s] that cross me."

[Exhibit "1", Simpson depo., p. 60]

**10. Second Write Up**

On February 18, 2015, true to his word, Cocke gave Simpson a second coaching for "failing to treat associates, customers, or vendors with respect or engaging in other inappropriate conduct towards others. [Exhibit "10", Progressive Disciplinary Notice dated February 18, 2015] Specifically, Simpson was written up for what happened during the incident on January 2, 2015, when Cocke had cussed him out in his office. [Exhibit "1", Simpson depo., p. 97] Simpson was

also written up for some missing interview packets, where he had done the interviews, but was unable to find the packets. [Exhibit "1", Simpson depo., p. 98]

**11.    Performance Appraisal for 2014**

Still, Simpson received a good performance appraisal for the 2014 year, and was rated a "Valued Associate . . . Well Positioned." [Exhibit "11", Evaluation for year 2014] Specifically, the appraisal stated:

> Jerrald is very involved in all areas of the business and he continues to grow his knowledge of Home Depot processes, procedures and computer systems. Jerrald has a property line to property line management style as he can be found in all areas of the store driving excellence.

[Exhibit "11", Evaluation for year 2014]

**12.    April 2015 Disciplinary Action**

On April 14, 2015, Simpson received another disciplinary action because of an issue with promotional signs. [Exhibit "12", Progressive Disciplinary Notice dated April14, 2015][2]  Simpson disputed that expired promotional signs were up, but it did not matter.  [Exhibit "1", Simpson depo., p. 109]  By this time, Simpson knew he had a bulls-eye on his back.  [Exhibit "1", Simpson depo., pp. 108-09]

**13.    Josiah Cocke Was Targeting Simpson for Termination**

Adam Ammar was a loss prevention manager for the Memphis district, until around July 2016.  [Exhibit "5", Ammar depo., p. 7] Ammar testified that when Simpson first started at Home Depot the first three (3) or four (4) months, Cocke loved him because he was very organized and

---

[2]Drew Gentry signed off on the disciplinary action, because he was at the store, training to replace Cocke at the time.  [Exhibit "1", Simpson depo., p. 109]

thorough. [Exhibit "5", Ammar depo., pp. 8-9] However, that did not last long, and after a few months, Cocke told Ammar that he was "going to get him . . . **He's going to get rid of that nigger**." [Exhibit "5", Ammar depo., pp. 10-11; emphasis added] Cocke told Ammar this on several occasions. [Exhibit "5", Ammar depo., p. 11]

### 14. Joel Cogdell Becomes District Manager

In the spring of 2015, Joel Cogdell, black, became the district manager for the Memphis area Home Depot stores, replacing Shannon Tucker, white. [Exhibit "1", Simpson depo., p. 113] Cocke was not happy working under Cogdell, because Cogdell would not call him back, but would return the calls of a black store manager, Reco Watson. [Exhibit "1", Simpson depo., pp. 113-14] Cocke made the statement, "What do I have to be fucking black to get him to call me back?" [Exhibit "1", Simpson depo., p. 113] Cocke transferred to a Home Depot in Jackson, Mississippi, because he did not want to work for Cogdell. [Exhibit "1", Simpson depo., p. 114]

### 15. Drew Gentry Became Store Manager at Horn Lake

In May 2015, Drew Gentry officially replaced Josiah Cocke as store manager of the Horn Lake Home Depot. [Exhibit "1", Simpson depo., p. 46] When Gentry arrived, he told Simpson that he was going to help him, and he did not see all the negative things that Cocke had told him about Simpson. [Exhibit "1", Simpson depo., p. 116] However, that did not last long, and shortly thereafter, Gentry was telling another ASM at Horn Lake, Ronnie Dinolfo, "Why don't they just let me fire his ass?" [Exhibit "1", Simpson depo., p. 122] Tracy Parnell, white, showed Shay Wilson

a text message from Gentry, where Gentry told Parnell not to worry about Simpson, because he was going to "**fire his black ass.**"[3] [Exhibit "6", Wilson depo., pp. 15-18, 31; emphasis added]

### 16. Final Warnings

In June 2015, Simpson received a final warning for not locking a door at closing. [Exhibit "1", Simpson depo., p. 128] One night at closing, a department manager had keys in hand to lock the front door, and assured Simpson that he would take care of locking up. [Exhibit "1", Simpson depo., p. 129] As it turned out, the department manager did not lock the door, and Simpson got written up for this. [Exhibit "1", Simpson depo., p. 129]

In September 2015, Simpson received a second final warning, because he did not call a customer back who had an issue with a column she wanted to purchase, because the employee at the service desk never gave him the customer's name and number. [Exhibit "1", Simpson depo., pp. 135-36; Exhibit "13", Progressive Disciplinary Notice dated September 29, 2015] Simpson was also written up because he believed he needed a electrician to take down a display that a customer wanted to buy. [Exhibit "13", Progressive Disciplinary Notice dated September 29, 2015]

### 17. Gentry Mistreated Black Employees

Gentry repeatedly mistreated black associates and black department heads, as Simpson testified, "It's blatant." [Exhibit "1", Simpson depo., p. 153] Simpson believes he was treated less favorably than the two (2) white associates, Ronnie Dinolfo and Kristie Flitsch, by Gentry. [Exhibit "1", Simpson depo., p. 153] The black department heads at Horn Lake did not receive support from

---

[3]Defendant claims that this text message that Wilson read is "rank hearsay." [Docket 37, p. 17] Defendant is incorrect. This is admissible as an admission by a party opponent. FRE 801(d)(2)(C) and (D). At the time that Drew Gentry sent the text, he was the store manager for the Horn Lake Home Depot, and Simpson's direct supervisor. Gentry sent the text concerning terminating Simpson. Gentry was the person who did, in fact, terminate Simpson.

Gentry as well, including Beverly Lewis and Shay Wilson.  [Exhibit "14", Typed Statement to the EEOC][4]

During her deposition, Shay Wilson confirmed that she did not receive the support she thought she should have received from Gentry, at least, in part, because of her race.  [Exhibit "6", Wilson depo., pp. 12-13] In the case of one particular white subordinate of Wilson's, Melody Craddock, Gentry would support the white associate over her.  [Exhibit "6", Wilson depo., pp. 19-20] For another white associate, Erica Trevino, Wilson received the same treatment from Gentry. [Exhibit "6", Wilson depo., pp. 21-23]

### 18. Roundtable

After Gentry became the store manager, district HR manager James Turner conducted a roundtable discussion on Gentry, asking employees for feedback.  [Exhibit "6", Wilson depo., pp. 27-28] Afterwards, Gentry was allowed to come back into the room and see the comments.  [Exhibit "6", Wilson depo., pp. 27-28]

The next day, Gentry conducted a round table discussion with the department heads and associates concerning Simpson, on a day that Simpson was not there.  [Exhibit "1", Simpson depo., p. 154; Exhibit "7", McCraney depo., p. 12]  Shay Wilson testified that she was not comfortable doing this, because this was not done with the white ASMs, and she told Drew it wasn't right.  [Exhibit "6", Wilson depo., pp. 29-30] McCraney also did not think it was fair because Simpson was not there.  [Exhibit "7", McCraney depo., p. 13]  Gentry tried to get the black department heads to say something negative about Simpson. [Exhibit "6", Wilson depo., p. 30] McCraney confirmed that

---

[4]During his deposition, Simpson swore that everything in this typed statement he sent to the NAACP and the EEOC was true and correct to the best of his knowledge, making it competent summary judgment evidence.  [Exhibit "1", Simpson depo., pp. 176-77]

Gentry did not do a roundtable for the two (2) white ASMs, Ronnie Dinolfo and Kristie Flitsch. [Exhibit "7", McCraney depo., p. 13]

### 19. Gentry Was Targeting Simpson for Termination

Gentry had a problem with Simpson because of his race, and was targeting Simpson for termination. [Exhibit "6", Wilson depo., pp. 23-25] Shay Wilson testified that she and other employees were told that if Simpson did anything wrong or that they did not like, write a statement on it. [Exhibit "6", Wilson depo., pp. 24] Gentry was not asking employees to write statements about any of the white ASMs. [Exhibit "6", Wilson depo., p. 25]

McCraney confirmed that Gentry was targeting Simpson for termination. [Exhibit "7", McCraney depo., p. 11] McCraney testified that his subordinates told him that Gentry had asked them to write statements against Simpson so he could get him out of there. [Exhibit "7", McCraney depo., p. 11]

### 20. More Issues with Tommy Lee

In December 2015, Simpson continued to have issues with one of his white department heads, Tommy Lee, because Lee would not do what Simpson instructed him to do. [Exhibit "1", Simpson depo., pp. 137-38] Again, Gentry would not allow Simpson to coach Tommy Lee, the white department head, but insisted the Simpson coach Duran, a black department head. [Exhibit "1", Simpson depo., p. 139] Gentry admitted that he would not allow Simpson to discipline Tommy Lee. [Exhibit "1", Simpson depo., p. 9]

21.     **December 9, 2015 Incident**

On December 9, 2015, Simpson responded to a call from the pro desk[5] to assist associates

with loading lumber in the garden area. [Exhibit "15", Simpson Narrative][6] On his way to the garden

center, Simpson asked another key holder, Patricia "Trish" Hardy,[7] white, for some assistance.

[Exhibit "15", Simpson Narrative]  When Simpson arrived at the garden center, Simpson was told

that two (2) associates, David Holloway and Jeff Denhart, both white,  needed help with a customer

in the parking lot.   [Exhibit "15", Simpson Narrative]  When Simpson approached the customers,

he asked them if they needed any help.  [Exhibit "15", Simpson Narrative] Simpson noticed that they

had already loaded the lumber on their truck. [Exhibit "15", Simpson Narrative] Simpson asked his

associates to ask them to move their truck to pull under the canopy, so they could sign off on their

ticket, which was standard procedure.[8]  [Exhibit "15", Simpson Narrative] The customers could not

find the receipt, so Simpson offered to hold the lumber until they could get the receipt.  [Exhibit

"15", Simpson Narrative] The customers said they would pull to under the canopy, but once they got

---

[5]The "pro desk" is the professional sales desk that caters to professional contractors. [Exhibit "16", Gentry depo., pp. 22-23] Brandy Carpenter was the associate who called for Simpson, because she had been notified of suspicious activity, specifically, customers claiming they bought lumber at one side of the building, but then loading it on their truck at the garden center, the other side of the building. [Exhibit "17", Carpenter depo., p. 8]

[6]During his deposition, Simpson swore that everything in his narrative was true and correct to the best of his knowledge making it competent summary judgment evidence.  [Exhibit "1", Simpson depo., pp. 176-77]

[7]At the time of her deposition, Patricia "Trish" Hardy had been recently married, and her name was changed to Patricia Lundebo. [Exhibit "18", Lundebo depo., pp. 5-6] Not surprisingly, "Trish," who falsely claims that Simpson told her to call the police, was a department head at the time of the incident, but was later promoted to the position of ASM under Drew Gentry. [Exhibit "18", Lundebo depo., pp. 9, 11]

[8]The canopy also had security cameras and Simpson was a little nervous because when the customers were looking for the receipt they we reaching in their truck and he did not know whether they had a weapon in there.  [Exhibit "1", Simpson depo., pp. 146-47]

-12-

in the truck, they drove off.[9] [Exhibit "15", Simpson Narrative] Simpson got the license plate of the truck. [Exhibit "15", Simpson Narrative] Simpson later found out that Patricia had called the police. [Exhibit "15", Simpson Narrative] Approximately fifteen (15) minutes later, Gentry arrived, and they met with the police. [Exhibit "15", Simpson Narrative]

Adam Ammar, loss prevention manager, viewed the tape of the incident, and testified there is no evidence that Simpson called the police. [Exhibit "5", Ammar depo., p. 26] Further, Ammar could not understand what policy violation they claim that Simpson committed. [Exhibit "5", Ammar depo., p. 26]

### 22. Simpson is Terminated

On February 15, 2016, over two (2) months later, Simpson was terminated by Drew Gentry, allegedly because of the events that happened on December 9, 2015. [Exhibit "19", Progressive Disciplinary Notice dated February 15, 2016]

At first, Simpson thought it was a joke, because when he read the document it stated that "pine straw" was involved, which was not correct, it was lumber. [Exhibit "1", Simpson depo., p. 142] In the termination notice, it claims that Simpson violated a minor work rule of Asset Protection by: 1) attempting to conduct a receipt check outside the store; and 2) contacting law enforcement concerning a possible theft situation. [Exhibit "19", Progressive Disciplinary Notice dated February15, 2016]

Simpson denies he violated any work rule, and denies he did either of these things Defendant claims that warranted his termination. [Exhibit "1", Simpson depo., p. 142] Specifically, Simpson denies doing a receipt check in the parking lot, and telling the customers that they couldn't leave

_____

[9]The customers were later fired by their employers, because they had, in fact, stole the lumber. [Exhibit "20", Holloway depo., p. 20]

-13-

until they showed their receipt in the parking lot. [Exhibit "1", Simpson depo., pp. 143, 186] Simpson denies telling Patricia Hardy to call the police. [Exhibit "1", Simpson depo., p. 143] Simpson denies he did anything improper that warranted disciplinary action. [Exhibit "1", Simpson depo., p. 186]

### 23. Gentry's False Accusations Against Simpson

Gentry claimed that Simpson was dishonest, changed his story, and gave three (3) contradictory versions of the incident. [Exhibit "21", Email from Gentry dated December 16, 2015] However, when Gentry was asked at his deposition what the three (3) different versions of the events were, all he claimed was:

> At one point, he was in the parking lot. At another point he was not in the parking lot. At one point, he had ran out there. At one point he had walked out there. His story of the events changed.

[Exhibit "16", Gentry depo., pp. 31-32]

> Later, Gentry testified:

> I believe the first version, Mr. Simpson had said that he had gone out into the parking lot with the associates. . . . And then the next version, he had sent associates out to the parking lot. And then, by the end version, he had not even been in the parking lot. . . . Mr. Simpson's involvement in the incident, by the time he got to the third version, was almost nonexistent.

[Exhibit "16", Gentry depo., p. 34]

This was not true; Simpson has only given one (1) version, the version he documented the day of the incident. [Exhibit "1", Simpson depo., pp. 176, 182; Exhibit "15", Simpson Narrative] What Simpson wrote in his narrative just contained more details than his verbal version of events. [Exhibit "1", Simpson depo., p. 184] However, nothing that Simpson verbally told Gentry contradicted anything Simpson wrote in his statement. [Exhibit "1", Simpson depo., pp. 184-85]

-14-

Simpson does not dispute that it took him several hours to write the statement, because he was working at the time, and taking care of business on the sales floor. [Exhibit "1",Simpson depo., p. 183]

Gentry also claimed that Simpson endangered the lives of Trish and the two (2) associates, by deciding to stop these customers in the parking lot. [Exhibit "22", Investigation] Simpson denies this claim as well, as he explained, "No, I didn't. As a matter of fact, I was propelled in the situation. It was already in progress. I was called out." [Exhibit "1", Simpson depo., p. 182]

### 24. White Employees Received No Discipline

After being terminated by Home Depot, Simpson went to the Horn Lake police department to get an incident report. [Exhibit "1", Simpson depo., p. 149] Not surprisingly, the only name listed under "caller information" is "Trish." [Exhibit "23", Calls for Service Sheet] The white key holder, Patricia "Trish" Hardy, who actually called the police, did not receive any disciplinary action. [Exhibit "18", Lundebo depo., p. 13]

The two (2) white associates, Holloway and Denhart, who actually violated the lumber loading procedures, were not terminated. [Exhibit "1", Simpson depo., p. 148] In fact, David Holloway testified that he did not receive any disciplinary action for what happened. [Exhibit "20", Holloway depo., p. 18]

### 25. Norma Kincaid/Stephen Davidson

-15-

Norma Kincaid, while store manager at the Olive Branch Home Depot, chased suspected shoplifters into the parking lot on a couple occasions, and is still employed at Home Depot as a store manager. [Exhibit "24", Davidson depo., pp. 8-11]  As Stephen Davidson[10] testified:

> There was a customer with a basket full of merchandise.  I was at the service desk, getting my returns to put up.  He started to run out the front door with that basket of merchandise.  Norma [Kincaid] was right up there where the greeter is.  She took off after him.  She was hollering at him to stop with her basket of merchandise.

[Exhibit "24", Davidson depo., p. 11]

Davidson followed Kincaid out of the door, found the customer in his car, and he and Kincaid surrounded the car.  [Exhibit "24", Davidson depo., p. 12]  When they returned to the store, District Manager Joel Cogdell was looking straight at them.  [Exhibit "24", Davidson depo., p. 12] Kincaid told Davidson to lie if Cogdell asked them what they were doing.  [Exhibit "24", Davidson depo., pp. 12-13]  However, Cogdell never asked them why they were chasing a shoplifter into the parking lot.  [Exhibit "24", Davidson depo., pp. 12-13] No one asked Davidson to give a statement, so obviously there was no investigation, and Kincaid did not receive any disciplinary action because of this.  [Exhibit "24", Davidson depo., p. 14]

Davidson also testified that he has gone into the parking lot approximately twelve (12) times to ask a customer to see a receipt on merchandise.  [Exhibit "24", Davidson depo., p. 14] Davidson would do so if the customer had loaded some merchandise, which he did not help load, and he wanted to make sure they were getting what was on the receipt.  [Exhibit "24", Davidson depo., p. 15]  No one has ever told him he can not go into the parking lot and ask for a receipt.  [Exhibit "24", Davidson depo., p. 15] Further, he did not believe he was doing anything wrong, and has never been

_____

[10]Stephen Davidson is currently working part-time as an associate at the Olive Branch Home Depot. [Exhibit "24", Davidson depo., pp. 5-6] Recently, he took his social security retirement, and stepped down from his position as a department head to only work part time.  [Exhibit "24", Davidson depo., pp. 5-6]

disciplined for following customers and asking for receipts. [Exhibit "24", Davidson depo., pp. 15-16]

### 26. Gentry Made the Decision to Terminate Simpson

Gentry admits that he terminated Simpson, but claims that he did so because AACG sent a recommendation down. [Exhibit "16", Gentry depo., p. 39] Gentry is being too modest.

Joel Cogdell has been the district manager over the ten (10) Home Depots in the Memphis area since October 2014. [Exhibit "25", Cogdell depo., p. 6] Cogdell testified that the recommendation of the AACG is not mandatory. [Exhibit "25", Cogdell depo., p. 10]

Layne Thome is the regional Human Resources ("HR") manager for Home Depot. [Exhibit "26", Thome depo., p. 5] Thome's region includes the Home Depots in the Memphis area. [Exhibit "26", Thome depo., pp. 5-6] James Turner is one of the fifteen (15) district HR managers who reports to her. [Exhibit "26", Thome depo., pp. 9-10]    Layne Thome testified that disciplinary decisions concerning ASMs are made by the store manager, who, in this case, was Drew Gentry. [Exhibit "26", Thome depo., pp. 11-12]

Belinda Thomas has been the regional associate relations manager for Home Depot since November 2015. [Exhibit "27", Thomas depo., pp. 6, 13] Thomas testified that she does not have any authority to terminate an employee. [Exhibit "27", Thomas depo., p. 7] Thomas testified that the store manager has the ultimate authority to terminate an ASM. [Exhibit "27", Thomas depo., p. 8]

### 27. Replaced by a White Employee

Jerrald Simpson, black, was ASM over specialty. [Exhibit "7", McCraney depo., pp. 14-16] After he was terminated, he was replaced as the specialty ASM by Brett Bigalow, white. [Exhibit "7", McCraney depo., pp. 14-16; Exhibit "5", Ammar depo., p. 21; Exhibit "16", Gentry depo., p.

17; Exhibit "28", Defendant's Response to Interrogatory No. 13] Ronnie Dinolfo, white, was ASM over merchandising at Horn Lake, and he was replaced as the merchandising ASM by Anthony Lockhart, black. [Exhibit "16", Gentry depo., p. 17]

Drew Gentry was trying to save Ronnie Dinolfo's job, but he told Adam Ammar after Jerrald Simpson was fired, "I finally got Jerrald." [Exhibit "5", Ammar depo., p. 23]

### STANDARD OF REVIEW

FEDERAL RULE OF CIVIL PROCEDURE 56(a) requires that a court grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the non-movant. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) *(en banc)*. When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Rather, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"Although summary judgment is a useful device, it must be used cautiously or it may lead to drastic and lethal results." *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980).

-18-

## ARGUMENTS AND AUTHORITIES

### 1.       Race Discrimination

Title VII and 42 U.S.C. § 1981 claims of race discrimination may be proven with either direct or circumstantial evidence.[11] *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 192-92 (5th Cir. 2001); *Meinecke v. H&R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 1995).  When a plaintiff presents direct evidence of intentional discrimination, "The burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor."  *Brown v. East Mississippi Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993).

In this case, Plaintiff has provided direct evidence of racial animus, and summary judgment should be denied.  Both of the white managers that Simpson worked under at Home Depot, and who issued him disciplinary actions that led to his termination, expressed racial animus against Simpson because of his race, and used vile racial epithets against him.  Josiah Cocke told Adam Ammar that, **"He's going to get rid of that nigger."**   [Exhibit "5", Ammar depo., pp. 10-11; emphasis added] Drew Gentry sent a text message to Tracy Parnell that he was going to "**fire his black ass.**"  [Exhibit "6", Wilson depo., pp. 15-18, 31; emphasis added]

More commonly, however, plaintiffs lack any sort of "smoking gun" evidence of discrimination, and must resort to proving their case circumstantially through the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

---

[11]Courts analyze race discrimination, race harassment and race retaliation claims under 42 U.S.C. § 1981, using the same as Title VII claims.  *Williams v. E.I. du Pont de Nemours and Co.*, 2015 WL 9581824 , * 11 (M.D. La. 2015); *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002)

### A. *Prima Facie*

In order to make a circumstantial *prima facie* case of unlawful race discrimination in a termination case, Jerrald Simpson need only introduce evidence that:

(1)     he is a member of a protected class;

(2)     he is qualified;

(3)     he experienced an adverse employment decision; and

(4)     he was replaced by someone outside the protected class, or he was treated less favorably than employees outside the protected class.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *Smith v. City of Jackson, Miss.*, 351 F.3d 183, 196 (5th Cir. 2003); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 223-24 (5th Cir. 2000); *Medina v. Ramsey Steel Co., Inc.,* 238 F.3d 674 (5th Cir. 2001).

"To establish a *prima facie* case, [the plaintiff] need only make a very minimal showing." *Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 41 (5th Cir. 1996).

Defendant concedes that Simpson can satisfy the first three (3) prongs of the *prima facie*, but denies that Plaintiff can satisfy the fourth prong.

#### (1)     Protected Class

Jerrald Simpson is a black male, a protected class.

#### (2)     Qualified

Simpson has a bachelor degree in business, and over twenty (20) years of management experience in retail.

#### (3)     Adverse Employment Decision

On February 15, 2015, Simpson was terminated.

(4)    ***Replaced by Another Race and/or Gender /Treated Less Favorably***

Simpson was replaced as specialty ASM at the Horn Lake Home Depot by Brett Bigalow, white.

Further, a plaintiff can also satisfy a *prima facie* by showing that he did not violate the work rule that a defendant claims he violated. In work-rule violation cases, a Title VII plaintiff may establish a prima facie case by showing "either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly". *Green v. Armstrong Rubber Co.,* 612 F.2d 967, 968 (5th Cir.), *cert. denied,* 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980). *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995).

In this case, Simpson can satisfy the fourth prong of the *prima facie* because he denies he violated a work rule. Simpson denies that he did a receipt check in the parking lot. Simpson denies he called the police. Regardless, the white employees who did received no disciplinary action.

Simpson can make a *prima facie* case of race discrimination because he can show he was replaced by a white male, or under the work rule violation doctrine.

### B.    Legitimate Non-Discriminatory Reason

Once a plaintiff has made his *prima facie* case, the burden of production shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse employment decision. *Nowlin v. Resolution Trust Corporation*, 33 F.3d 498, 507 (5th Cir. 1994).

Defendant claims that Simpson was terminated for doing a receipt check in the parking lot and calling the police.

## C. Pretext Alternative/Mixed-Motive Alternative

In the third step in this burden-shifting framework, a plaintiff must produce evidence that the proffered reason is probably false, or may not be the real reason. If the plaintiff does so, he has created a jury question which would make summary judgment improper.

The United States Supreme Court has held:

> The defendant's "production" (whatever its persuasive effect) having been made, the **trier of fact** proceeds to decide the ultimate question: whether plaintiff has proven "that the defendant intentionally discriminated against [him]" because of his race. The **factfinder's disbelief** of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, **rejection of the defendant's proffered reasons will *permit* the trier of fact** to infer the ultimate fact of intentional discrimination . . . upon such rejection, no additional proof of discrimination is *required.*

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (emphasis added and citations omitted).

In *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711 (1983), the late Chief Justice Rehnquist aptly stated why summary judgment should rarely be granted in discrimination cases once the plaintiff has made a minimal showing of her *prima facie* case and has put forth some evidence that the proffered legitimate, non-discriminatory reason is pretext:

> All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult. The prohibitions against discrimination contained in the Civil Rights Act of 1964 reflect an important national policy. There will seldom be "eyewitness" testimony as to the employer's mental processes. "The law often obliges finders of fact to inquire into a person's state of mind. As Lord Justice Bowen said in treating this problem in an action for misrepresentation nearly a century ago:
>
> > The state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else." *Eddington v. Fitzmaurice,* 29 Ch.Div. 459, 483 (1885).

*U.S. Postal Service Bd. of Governors,* 460 U.S. at 716-17.

According to *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 146 (2000): "[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."

Further,

Plaintiff then has the ultimate burden of proving intentional discrimination. *Id.* Under title VII, the plaintiff must prove that (1) the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative), or (2) the defendant's reason, though true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative). *Id.*; see also *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 94, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

*Davis v. Farmers Ins. Exchange*, 372 Fed.Appx. 517, 519, 2010 WL 1404000, 2 (5th Cir. 2010).

## 1.    *Pretext Alternative*

Jerrald Simpson has presented sufficient evidence, for purposes of a summary judgment motion, that the reason for which Home Depot stated it fired him is not credible, including:

1.    Simpson, black, received a bachelor of science in business administration from Mississippi Valley State University.  [Exhibit "1", Simpson depo., p. 14]

2.    Simpson worked for Wal-Mart for twenty (20) years, working his way up to being a co-operation Store Manager.  [Exhibit "1", Simpson depo., p. 16]

3.    The first year that Simpson worked at Horn Lake, he received good evaluations.  [Exhibit "3", Mid-Year Check-in dated September 6, 2013; Exhibit "4", Evaluation for year 2013]

4.    Josiah Cocke, white, was accused of race discrimination, and a black department head filed an EEOC charge against him, prior to Simpson working at Horn Lake.  [Exhibit "1", Simpson depo., pp. 49-51]

5.    Simpson was brought in to work at Horn Lake because of the EEOC charge of race discrimination, i.e., it needed a black ASM.  [Exhibit "5", Ammar depo., pp. 12-17]

-23-

6.   Cocke seemed concerned that he was perceived as being a racist after the EEOC charge. [Exhibit "1", Simpson depo., pp. 118-19] Cocke told Simpson, "That he grew up in black neighborhoods and he's one of the blackest white guys you will be able to see.  He enjoys rap music and all that..." [Exhibit "1", Simpson depo., p. 120]

7.   Other black employees expressed their issues to Simpson, but he did not want to believe them.  [Exhibit "1", Simpson depo., pp. 53-54]   Simpson was also concerned that if he complained about being treated differently because of his race, he would suffer repercussions.  [Exhibit "1", Simpson depo., p. 54]

8.   Simpson did not receive his first disciplinary until almost two (2) years after was hired at the Horn Lake store.  [Exhibit "8", Progressive Disciplinary Notice dated January 2, 2015] Simpson was allowed to coach his black department heads, but not his white department heads, especially, Tommy Lee.  [Exhibit "1", Simpson depo., pp. 83-86]   Many of the issues brought up in the first coaching were deficiencies in Tommy Lee's department.  [Exhibit "1", Simpson depo., pp. 86-89]

9.   Cocke held Simpson to a higher performance standard than the white ASMs, Ronnie Dinolfo and Krisite Flitsch.  [Exhibit "1", Simpson depo., p. 95]

10. On several occasions, Josisah Cocke, in referring to Simpson, told Adam Ammar, "He's going to get rid of that nigger."   [Exhibit "5", Ammar depo., pp. 10-11]

11.  After Joel Cogdell, black, became district manager, Cocke made the statement, "What do I have to be fucking black to get him to call me back?"  [Exhibit "1", Simpson depo., p. 113] Cocke transferred to a Home Depot in Jackson, Mississippi, because he did not want to work for Cogdell. [Exhibit "1", Simpson depo., p. 114]

12.  Gentry sent Tracy Parnell a text message stating not to worry about Simpson because he was going to "fire his black ass."  [Exhibit "6", Wilson depo., pp. 15-18, 31]

13.  Gentry repeatedly mistreated black associates and black department heads.  [Exhibit "1", Simpson depo., p. 153] Simpson was treated less favorably than the two (2) white associates, Ronnie Dinolfo and Kristie Flitsch, by Gentry.  [Exhibit "1", Simpson depo., p. 153] The department heads at Horn Lake did not receive support from Gentry, including Beverly Lewis and Shay Wilson.  [Exhibit "14", Typed Statement to EEOC]

14.  Gentry conducted a round table discussion with the associates concerning Simpson, on a day that Simpson was not there.  [Exhibit "7", McCraney depo., p. 12] Gentry tried to get the black department heads to say something negative about Simpson.  [Exhibit "6", Wilson depo., p. 30] Gentry did not do a roundtable for the two (2) white ASMs, Ronnie Dinolfo and Kristie Flitsch.  [Exhibit "7", McCraney depo., p. 13]

15.  Gentry had a problem with Simpson because of his race, and was targeting Simpson for termination. [Exhibit "6", Wilson depo., pp. 23-25] Employees were told that if Simpson did anything wrong, or that they did not like, to write a statement on it.  [Exhibit "6", Wilson depo., p. 24] Gentry was not asking employees to write statements about any of the white ASMs.  [Exhibit "6", Wilson depo., p. 25; Exhibit "7", McCraney depo., p. 11]

16.  Gentry would not allow Simpson to coach Tommy Lee, the white department head, but insisted that Simpson coach Duran, a black department head.  [Exhibit "1", Simpson depo., p. 139] Gentry admitted that he would not allow Simpson to discipline Tommy Lee. [Exhibit "1", Simpson depo., p. 9]

17. On February 15, 2016, over two (2) months later, Simpson was terminated by Drew Gentry, allegedly because of the events that happened on December 9, 2015. [Exhibit "19", Progressive Disciplinary Notice dated February 15, 2016]

18. The termination notice claims that Simpson violated a minor work rule of Asset Protection by: 1) attempting to conduct a receipt check outside the store; and 2) contacting law enforcement concerning a potential theft situation. [Exhibit "19", Progressive Disciplinary Notice dated February 15, 2016] Simpson denies he violated any work rule, and denies he did either of these things. [Exhibit "1", Simpson depo., p. 142] Simpson denies doing a receipt check in the parking lot, and telling the customers that they couldn't leave until they showed the receipt in the parking lot. [Exhibit "1", Simpson depo., pp. 143, 186] Simpson denies telling Hardy to call the police. [Exhibit "1", Simpson depo., p. 143] Simpson denies he did anything improper that warranted disciplinary action. [Exhibit "1", Simpson depo., p. 186]

19. Gentry falsely claimed that Simpson was dishonest, changed his story, and gave three (3) contradictory versions of the incident. [Exhibit "21", Email from Gentry dated December16, 2015]

20. Gentry falsely claimed that Simpson endangered the lives of the white key holder and the two (2) white associates by deciding to stop these customers in the parking lot. [Exhibit "22", Investigation] Simpson denies this claim, because he was called out to a situation that was already in progress. [Exhibit "1", Simpson depo., p. 182]

21. The white key holder who actually called the police, Patricia "Trish" Hardy, did not receive any disciplinary action. [Exhibit "18", Lundebo depo., p. 13]

22. The two (2) white associates, Holloway and Denhart, who actually violated the lumber loading procedures, were not terminated. [Exhibit "1", Simpson depo., p. 148] David Holloway did not receive any disciplinary action for what happened. [Exhibit "20", Holloway depo., p. 18]

23. Norma Kincaid chased suspected shoplifters into the parking lot on a couple occasions, and is still employed at Home Depot as a store manager. [Exhibit "24", Davidson depo., pp. 8-11] During one of these occasions, Joel Cogdell was looking straight at them, and there was no investigation conducted. [Exhibit "24", Davidson depo., pp. 12-14] No one asked Stephen Davidson to give a statement, so there was no investigation, and Kincaid obviously did not receive any disciplinary action because of this. [Exhibit "24", Davidson depo., p. 14]

24. Davidson has gone into the parking lot approximately twelve (12) times to ask a customer to see a receipt on merchandise. [Exhibit "24", Davidson depo., p. 14] No one has ever told him he can not go into the parking lot and ask for a receipt. [Exhibit "24", Davidson depo., p. 15] Further, Davidson has never been disciplined for doing so. [Exhibit "24", Davidson depo., pp. 15-16]

25. Gentry, who had wrote a text saying that he would get rid of his black ass, admits he terminated Simpson. [Exhibit "16", Gentry depo., p. 39] Disciplinary decisions concerning ASMs are made by the store manager, who, in this case, was Drew Gentry. [Exhibit "26", Thome depo., pp. 11-12]

26. Jerrald Simpson, black, was replaced as the specialty ASM by Brett Bigalow, white. [Exhibit "7", McCraney depo., pp. 14-16; Exhibit "5", Ammar depo., p. 21; Exhibit "16", Gentry depo., p. 17; Exhibit "28", Defendant's Response to Interrogatory No. 13]

27. After firing Simpson, Gentry told Adam Ammar, "I finally got Jerrald." [Exhibit "5", Ammar depo., p. 23]

## 2. *Mixed Motive Alternative*

Regardless, even if this Court concludes there is an indicia of truth in the proffered reasons for Simpson's termination, a reasonable jury could conclude that Simpson's race was a motivating factor, for all the reasons above. Specifically, both of the store managers that Simpson worked under at Horn Lake were white. Both of these white store managers made racist remarks concerning Simpson and their desire to fire him. Both expressed racial animus against him because of his race, and used vile racial epithets against him. Josiah Cocke told Adam Ammar that, **"He's going to get rid of that nigger**." [Exhibit "5", Ammar depo., pp. 10-11; emphasis added] Drew Gentry sent a text message to Tracy Parnell that he was going to **"fire his black ass."** [Exhibit "6", Wilson depo., pp. 15-18, 31; emphasis added] After Gentry was finally able to fire Simpson for false reasons, Gentry told Adam Ammar, "I finally got Jerrald." [Exhibit "5", Ammar depo., p. 23]

In *Stennett v. Tupelo Pub. Sch. Dist.*, No. 13-60783, 2015 WL 4569205, at *7 (5th Cir. July 30, 2015), the Fifth Circuit reversed the grant of summary judgment in favor of the Defendant holding: "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " *Id.* (quoting Wright & Miller 300). The Court continued: "Viewed as a whole and in the light most favorable to Stennett, we conclude that this evidence presents a set of facts from which a reasonable juror could disbelieve TPSD's claim that it refused to hire Stennett because she was less qualified." *Id.* at *12.

Viewed as a whole and in the light most favorable to Simpson, this evidence presents a set of facts, from which a reasonable juror could disbelieve the reasons Home Depot claims it terminated Simpson, and summary judgment should be denied.

**<u>CONCLUSION</u>**

For all the reasons stated herein, Plaintiff Jerrald Simpson requests that Defendant's Motion

for Summary Judgment [Docket 36] be denied in its entirety.

RESPECTFULLY SUBMITTED, this the 28th day of December, 2017.

JERRALD SIMPSON, Plaintiff

By:    */s/ Ron L. Woodruff*
Jim Waide, MS Bar No. 6857
waide@waidelaw.com
Ron L. Woodruff, MS Bar No. 100391
rlw@waidelaw.com
WAIDE & ASSOCIATES, P.A.
332 North Spring Street
Tupelo, MS  38804-3955
Post Office Box 1357
Tupelo, MS  38802-1357
(662) 842-7324 / Telephone
(662) 842-8056 / Facsimile

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

      This will certify that undersigned counsel for Plaintiff has this day filed the above and foregoing with the Clerk of the Court, utilizing the federal court electronic case data filing system (CM/ECF), which sent notification of such filing to the following:

**Lindsay Thomas Dowdle, Esquire**
**Jones Walker LLP**
**ldowdle@joneswalker.com**
**tkittrell@joneswalker.com**

**Andrew Scott Harris, Esquire**
**Jones Walker LLP**
**aharris@joneswalker.com**
**mgriffin@joneswalker.com**
**apittman@joneswalker.com**

**Jennifer F. Kogos, Esquire**
**Jones Walker LLP**
**jkogos@joneswalker.com**
**tpierre@joneswalker.com**

**David K. Theard, Esquire**
**Jones Walker LLP**
**dtheard@joneswalker.com**
**anebel@joneswalker.com**

DATED, this the 28th day of December, 2017.

                          */s/ Ron L. Woodruff*
                          Ron L. Woodruff