IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**JERRALD SIMPSON**                                                                              **PLAINTIFF**

**VS.**                                            **CAUSE NO. 3:17-CV-00007-MPM-JMV**

**HOME DEPOT U.S.A., INC.**                                                   **DEFENDANT**

## ORDER

This cause comes before the court on the motion of defendant Home Depot U.S.A, Inc. for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Jerrald Simpson has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that the motion is not well taken and should be denied.

This is a race discrimination action, filed pursuant to Title VII and 42 U.S.C. § 1981, in which plaintiff, an African-American male, seeks recovery arising out of his January 2016 termination as an assistant manager at the Horn Lake Home Depot. Plaintiff began working at Home Depot in May 2013, and defendant contends that he began "experiencing performance and behavioral issues" soon thereafter. For his part, plaintiff contends that his firing was the result of racial animus against him on the part of the two white individuals who served as managers of the Horn Lake store during his tenure, namely Josiah Cocke and Drew Gentry. Cocke served as store manager during most of plaintiff's tenure, until he transferred to another store and was replaced by Gentry in May 2015. As discussed below, plaintiff has offered testimony from two of his former co-workers, which defendant seeks to exclude on hearsay and other grounds, that Cocke and Gentry promised, respectively, to "get rid of that nigger" and to "fire [plaintiff's] black ass." Plaintiff argues that this proof suffices to establish that race was a motivating factor

in the decision to fire him, but defendant disagrees and seeks summary judgment, arguing that no genuine issue of material fact exists regarding its liability and that it is entitled to judgment as a matter of law.

In considering Home Depot's summary judgment motion, it strikes this court that defendant largely seeks to prevail in this case through motions in limine. That is, defendant argues that plaintiff's evidence that race may have been a motivating factor in his termination is inadmissible and that, for that reason, he lacks proof of racial discrimination in this case. However, this court concludes, for the reasons discussed below, that plaintiff's most important evidence of race discrimination is, in fact, admissible, and that genuine fact issues accordingly exist regarding whether race was a motivating factor in his termination. This court notes at the outset that the less-stringent "motivating factor" standard is, in fact, applicable to plaintiff's Title VII claim, and this makes his burden of surviving summary judgment easier than it would be under a "but for" causation standard. Indeed, this standard is sufficiently lenient that, if Cocke and Gentry's aforementioned alleged statements are deemed admissible, then the existence of potential liability on Home Depot's part seems rather clear to this court. In its brief, defendant spends considerable effort in documenting alleged performance deficiencies on plaintiff's part, but these deficiencies are largely contested by plaintiff, and, at any rate, do not serve to negate fact issues regarding whether race was at least a motivating factor in his firing.

Having highlighted the importance of Cocke and Gentry's alleged statements in this case, this court now turns to defendant's arguments that they are inadmissible. This court will consider Gentry's statement first, since he was the manager who made the decision to fire plaintiff, and his motivations are thus of obvious (and uncontested) importance in this case. In arguing that Gentry's decision to fire him was at least partially motivated by racial animus,

plaintiff relies upon the deposition testimony of Sharieka Wilson, a former department supervisor at Home Depot. In her deposition, Wilson testified that she personally saw a text message from Gentry to a supervisor (later identified as Tracy Parnell) in which Gentry discussed an intent to fire plaintiff's "black ass." Specifically, Wilson testified that:

> Wilson: So, with that, there was one incident where the other department supervisor, she showed me a text message of Drew, the store manager, stating some stuff that, in my opinion, shouldn't have been, you know, sent to another employee, regarding Jerrald and all of that, so.
> Q. And what did that text message say?
> Wilson: They were going back and forth regarding some things that they weren't -- I can't remember exactly, word for word, but there were some things that were going back and forth stating that, you know, Jerrald had done, or some stuff that people didn't like, you know, of Jerrald's management. And Drew had mentioned that -- in the text message that for that department supervisor not to worry because he would be fired, his black ass would be term -- you know, be
> Q. Did you see -- actually see with your own eyes a text from Drew when it talks about firing his black ass, referring to –
> Wilson: Yes, sir.
> Q. -- Jerrald Simpson?
> Wilson: Yes, sir.
> Q. Do you recall approximately when that was? In relation to his termination, how long was it before his termination?
> Wilson: I'm not exactly sure. It wasn't -- it wasn't long from his termination. It wasn't like, you know, this happened a year ago and then, you know, he got terminated. It wasn't that. It was -- I can't say, you know, like within the, you know -- it was – I can't recall. So I can't -- I don't want to say exactly when. Or, you know, I can't say when it happened, because I'm not exactly sure.

[Wilson depo. at 15-16].

Defendant argues that the above testimony presents inadmissible hearsay evidence, but this court disagrees. In so stating, this court first notes that it regards Wilson's deposition testimony as an indication of how she will testify at trial. Wilson is a crucial witness in this case, and this court assumes that she will, consistent with her deposition testimony, provide sworn in-court statements at trial that she personally saw a text message from Gentry regarding an intent to fire plaintiff's "black ass." Assuming that Wilson does so testify at trial, this court concludes

3

that such testimony would offer only one out-of-court statement, namely Gentry's "black ass" remark, and that this statement would not be hearsay for multiple, independently-sufficient reasons.

First, Gentry's statement is clearly an admission by a party opponent, since the Federal Rules of Evidence provide that statements are not hearsay if "offered against an opposing party . . . made by the party's agent or employee on a matter within the scope of that relationship and while it existed." F.R.E. 801(2)(D). This court can discern no good reason why this would not apply to Gentry's alleged statement. Moreover, to the extent that Gentry's alleged statement expresses an intent or plan on his part to fire plaintiff, this would clearly seem to fall under the scope of F.R.E. 803(3)'s exception for statements of the "declarant's then-existing state of mind (such as motive, intent, or plan)." Moreover, the term "black ass" is, in the court's view, the most important part of Gentry's alleged statement, and it is clearly being introduced to show Gentry's state of mind, namely that he had a racial-based mindset in wanting to fire plaintiff. As such, it is clearly not being offered to prove the truth of the matter asserted, particularly since it is undisputed that Gentry did, in fact, fire plaintiff.

In its reply brief and motion in limine, Home Depot argues that:

> The text message itself is considered hearsay. . . . However, Plaintiff alleges the text message itself is admissible as an admission by a party opponent. Even if this is true, it was then relayed by Shay Wilson, which is another level of hearsay, or double hearsay. Double hearsay is only admissible if an exception applies to each layer of hearsay. Ms. Wilson, a former hourly associate with Home Depot, is not a party opponent. There is no hearsay exception for Ms. Wilson's testimony relaying the alleged content of the text message. Therefore, such text message is not admissible and should not be considered as direct evidence or any evidence.

[Defendant's reply brief at 6 (citations omitted)].

Thus, defendant offers no real response to the argument that Gentry's text message is an admission by a party opponent, and it seems clear that this is the case. Defendant argues that an

4

additional layer of hearsay exists because the statement was "relayed by Wilson," who no longer works for Home Depot.[1] Once again, however, this court regards Wilson's deposition as an indication of *how she will testify at trial*. Hearsay is defined by the Federal Rules of Evidence as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Civ. P. 801(c). It seems clear that, any time a litigant uses the deposition testimony of a witness such as Wilson in the context of a summary judgment motion, it is utilizing statements that the declarant "does not make while testifying at the current trial or hearing." This does not mean, however, that, in deciding whether triable fact issues exist in this case, this court must disregard the possibility, indeed the strong likelihood, that Wilson will appear at trial and testify that she personally saw a text message from Gentry expressing an intent to fire plaintiff's "black ass." Assuming such testimony is provided by Wilson at trial, it would clearly represent a non-hearsay statement "at the current trial."

If it should develop that Wilson does *not* testify at trial, then this would, in fact, appear to render her deposition testimony hearsay under the definition set forth in 801(c). In that eventuality, this court would consider arguments regarding whether any hearsay exception applies to such statements, such as under Fed. R. Evid. 804(b)(1)'s exception for deposition testimony by witnesses whose attendance at trial cannot be procured "by process or other reasonable means." This Rule 804 exception illustrates that the admissibility of deposition testimony at trial cannot, generally speaking, be definitely resolved at the summary judgment

---

[1] Defendant cites no authority indicating that the current status of the employee is the dispositive factor, and this court wonders whether an employer could limit potentially harmful testimony by simply firing an employee before he or she could testify. Regardless, this issue is not material in this case, for the reasons discussed below.

stage, since the question of whether deposition testimony is hearsay may depend upon factors such as whether the deponent is available to testify at trial, and, if not, why not.

This court will not prejudge these issues, but it does consider it appropriate to regard Wilson's deposition testimony as evidence of how she will testify at trial, and, so considered, it supports plaintiff's contention that triable fact issues exist regarding Gentry's motivations in firing her. This court notes that, factually speaking, there is conflicting evidence in the record regarding the reliability of Wilson's account of what Gentry said in his text message. Rodney McCraney, a former department head at the Horn Lake store, testified that Wilson told him about the alleged text message while they were working together at the store, stating that:

> Q: Were you aware of any racial text messages sent by Drew in regard to Jerrald Simpson?
> McCraney: The one that Shay told me about that she got from -- that Tracy showed her. It was "I'm going to get rid of his black ass," or something of that nature.
> Q: But you never saw that?
> McCraney: I never saw it, no.
> Q: But Shay told you about it?
> McCraney: Yes.

[McCraney Depo. at 16]. Clearly, if the jury believes McCraney's testimony that Wilson made contemporaneous complaints to him about Gentry's alleged text message, then this would make it less likely to conclude that this was simply something which she fabricated to assist plaintiff in this lawsuit.

For its part, Home Depot has submitted a sworn declaration in which Parnell denies that she ever received the alleged text message from Gentry. Thus, there is conflicting evidence on this point, which is clearly a fact issue for the jury's resolution. Defendant may seek to argue that former Home Depot employees such as Wilson harbor a grudge against the company, but plaintiff could similarly argue that a *current* Home Depot employee such as Parnell would have every motivation to offer helpful testimony in support of her current employer. Evaluating the

6

credibility of witnesses is a classic jury function, and it would clearly be improper for this court to undertake this role on summary judgment. At this juncture, this court must view the evidence in the light most favorable to plaintiff, as the non-moving party, and it must therefore regard Wilson's testimony as being at least potentially credible.

This court notes that, Gentry's alleged text message aside, there is testimony from multiple employees that he showed a particular interest in hearing negative reports about plaintiff. For example, McCraney testified that, during a roundtable meeting with employees in which plaintiff was absent, Gentry insisted that employees provide evaluations about plaintiff's performance, in a manner in which McCraney perceived to be fishing for negative information. Specifically, McCraney testified that:

> With Jerrald, he wasn't present this day or anything. And he brought us all, as a DH team, together to talk about Jerrald. And, you know, he did ask the good, the bad, and what we think he could work on. But it was just like, when we didn't comment -- like, I didn't want to comment, because I'm like, he's not here. I didn't feel right about the situation. So he just made it where, no, you have to say something. And it was me and maybe three other people that didn't comment. He tried to tell us we had to comment and everything and give some type of opinion, because he knew some people had their way they felt about Jerrald. So I felt like it was more so of a negative thing. If it was a training thing that he was trying, you know, get the good out, really, he would have had him present too, like he was present when we did it on him.

[McCraney Depo. at 12-13].

Wilson similarly testified that Gentry singled plaintiff out for special scrutiny in his review of his work performance:

> Q. What was said to you? I'm sorry.
> Wilson: -- Drew telling different associates, as well as, you know, department supervisors, anybody, "Whatever may be going on, if Jerrald does anything that you don't like or whatever he may have done, write a statement on it"
> Q: So he encouraged the other employees there, including yourself, to write --
> Wilson: To write statements.
> Q: -- statements on Jerrald. Is that what you mean by targeting him for termination?
> Wilson: Yes, because it was -- like I said, you know, people talk around workplaces, whatever. So there was -- there had been plenty of -- many conversations regarding, you

7

know, associates who did not care for Jerrald or anything like that. And one of the, you
know -- a lot times they were like "Oh. Well, you know, Drew told me to do this. Drew
said if we have any problems with him, do this and do that."

[Wilson depo. at 23-24].

Considered in the light most favorable to plaintiff, Wilson and McCraney's testimony might reasonably lead a jury to conclude that Gentry, as the final decision-maker regarding plaintiff's termination, had targeted him for special scrutiny and that this may have been based, at least partly, on his race. In so stating, this court acknowledges that the record contains numerous references to issues which Home Depot employees had with plaintiff's "detail oriented" management style. In her own deposition, for example, Wilson testified that:

> Q. Did you ever have any issues with Jerrald Simpson?
> Wilson: Not any that, you know -- nothing really, nothing too bad.
> Q. From your observations, what type of manager was he?
> Wilson: Jerrald was a manager who liked detail. He wanted to make sure everything was flowing -- he was very detailed oriented; made sure that, you know, all of his ducks were in a row and associates were all on the same page with what we were to do throughout the day, our whole, you know, schedules.

[Id. at 10].

From reviewing the record in this case, it seems clear that some Home Depot employees may have chafed under plaintiff's management style, and Wilson herself could only offer that any issues she had with plaintiff were "nothing too bad." Indeed, Wilson's testimony strikes this court as being rather balanced, which may lend it additional credence in the eyes of a jury. Much like evaluating the credibility of witnesses, determining what factors motivated a particular individual is a classic jury function, and this court concludes that a jury should resolve these issues in this case. While a jury may well find that legitimate deficiencies in plaintiff's management style and work performance were the real reasons for his termination, Wilson's description of Gentry's text message may also lead them to conclude that race at least played a

role in it. Regardless, this court concludes that, assuming that Wilson does appear at trial to testify regarding Gentry's text message, such testimony would constitute admissible non-hearsay evidence.

This court now turns to defendant's motion to exclude the alleged statements of plaintiff's former manager Cocke, which, if true, demonstrate an even clearer racial-based animus against plaintiff than is the case with Gentry's statement. In seeking to prove that Cocke was motivated by racial hatred against him, plaintiff relies upon the deposition testimony of Adam Ammar, a former loss prevention manager at the Horn Lake store. Defendant has likewise moved to exclude Ammar's deposition testimony, both on grounds of hearsay and because he improperly offered lay opinions regarding the motivations of Cocke and Gentry in firing plaintiff. This court finds defendant's motion in limine to be partially meritorious as to the latter ground, since Ammar did offer certain opinions regarding what motivated the Home Depot managers without adequately establishing that he had personal knowledge of the facts in this regard.

In his deposition, Ammar testified that Gentry had essentially inherited an animosity towards plaintiff from Cocke, and that, as a result, plaintiff "never stood a chance" with Gentry. [Ammar deposition at 8]. Specifically, Ammar testified that:

> Q. Were you aware of whether or not Drew Gentry was targeting Jerrald Simpson for termination?
> Ammar: Yes.
> Q. And what is your knowledge of that?
> Ammar: Drew -- I believe -- it started with Josiah, to be honest, with Josiah Cocke. And Drew took the word from Josiah of Jerrald. He didn't form his own opinion of Jerrald. Jerrald never had a chance with Drew.

[Ammar Depo. at 8]. Defendant has filed a motion in limine to exclude Ammar's lay opinions regarding the motivations of Cocke and Gentry, arguing that he had no factual basis for making

9

such remarks. However, Ammar did testify in his deposition that he had become a close confidant of Cocke and that his testimony was based on personal knowledge of his views:

> Q. All you've told me about, these issues with Jerrald and Josiah, is that based upon your personal observations and conversations with --
> Ammar: Conversation with Josiah. Me and Josiah actually started -- I met Josiah probably in 2006, working in Oxford. We worked together doing inventory in Oxford, Mississippi. We were brought down as help for -- it used to be our district -- to help the store to catch up. So me and Josiah -- Josiah was just a DH at the time.
> Q. Uh-huh.
> Ammar: And I was just an hourly associate. And so me and Josiah, we hit it off. You know, we had sort of the same work history and same -- you know what I mean -- different stuff. We had the same interests in things, and stuff like that. So Josiah was very comfortable with me and said many things in front of me.

[Ammar deposition at 10].

This court tends to agree with plaintiff that Ammar had a factual basis for offering at least some testimony regarding Cocke's views, but it is not clear that he had any such basis for testifying that these views influenced *Gentry*, with whom he had no such close relationship. This court will therefore tentatively grant defendant's motion in limine, to the extent that it relates to Ammar's views regarding the motivations of other individuals, as to which he lacks specific personal knowledge. This court notes that, even as to his opinions about Cocke's motivations, Ammar ventured into some highly specific testimony, and this court wonders whether he had personal knowledge regarding these matters. For example, Ammar offered his opinion that Cocke disliked plaintiff, partly because, in Ammar's view, he believed that plaintiff acted like he was "better than everyone else." Specifically, Ammar testified that:

> [Plaintiff] always dressed in slacks and everything else, and he was more of a manager, in my personal opinion, and many other people. He manages people. And he would follow up -- he would tell -- write work lists and follow up with them, and so forth like that. And Josiah didn't like that, because Josiah felt like Jerrald was acting like he was better than everybody else, because he would wear slacks to work -- you know what I mean -- sweaters and stuff that, you know; didn't look like he wanted to get dirty.

10

[Id. at 9-10]. It is not clear to this court that Ammar had *specific* personal knowledge that Cocke harbored these views, and this court directs that plaintiff elicit no testimony from Ammar at trial regarding the motivations of either Cocke or Gentry unless he had specific personal knowledge regarding their motivations.

Having addressed (and limited) Ammar's testimony regarding the motivations of others, this court now turns to defendant's motion to exclude his testimony that Cocke promised him, when speaking of plaintiff, that "he's going to get rid of that nigger." Unlike Ammar's testimony regarding the motivations of others, this testimony is clearly based upon his (alleged) personal knowledge, and it leaves little doubt regarding the nature of Cocke's motivations. Specifically, Ammar testified that:

> Q: Did [Cocke] ever make any comments about Jerrald's race?
> Ammar: Yes.
> Q: And what did he say?
> Ammar: You know, you want word for word?
> Q: Absolutely. You're under oath.
> Ammar: He's going to get rid of that nigger.
> Q: He told you that?
> Ammar: Unfortunately, yeah.
> Q. More than once, or no?
> Ammar: Multiple times. Multiple times.

[Page 11].

In the court's view, these alleged statements constitute both admissions by a party opponent and evidence regarding Cocke's state of mind (including future intent) and are thus clearly not hearsay. Moreover, as with Wilson's deposition testimony, this court regards Ammar's deposition as an indication of how he will testify at trial, and it concludes that he may testify at trial that he personally heard Cocke state these words. This court stated the reasons for this conclusion in its discussion of Gentry's alleged "black ass" remark, and it will not repeat that discussion here.

11

Defendant argues that, even assuming that Cocke's alleged statements are not hearsay, they are not relevant since he transferred to another Home Depot store in May 2015 and thus had no direct role in plaintiff's firing. The problem with this argument is that, in seeking summary judgment, defendant has relied upon negative evaluations of plaintiff's work performance which were *written by Cocke*. True enough, many of Cocke's evaluations were positive, but some of them were certainly negative and clearly led to Home Depot's decision to investigate plaintiff's fitness as an employee. In its brief, for example, Home Depot acknowledges that its internal Human Resources unit, known as the Associate Advice and Counsel Group (AACG) "conducted an investigation into Mr. Cocke's concerns" that plaintiff was acting in a "disrespectful and insubordinate" way towards him. Specfically, Home Depot writes that:

> After Mr. Cocke issued this written counseling to Plaintiff, Mr. Cocke submitted a Manager's Note on January 5, 2015, noting that "[d]uring our coaching on Friday 1-2-15 Jerrald was very disrespectful and insubordinate. I've already written my statement and I'm partnering with AACG today & I have a witness statement from another SM who was in the room at the time." Thereafter, the AACG conducted an investigation into Mr. Cocke's concerns.

[Defendant's brief at 8].

Plaintiff provides a very different account of his January 2015 meeting with Cocke, writing in his brief that:

> On or about January 2, 2015, Simpson opened up the store, and approximately thirty (30) minutes later, Cocke arrived and called him to his office. Cocke was upset about something, and was making wild hand gestures. Simpson asked to take a break, because he was not able to absorb what was going on, as he explained, "Why don't we take a break so you can calm down..." This made Cocke more upset, and he started cursing and became even more erratic, "No . . . we're not going no fucking where. We're sitting right here and we're going to deal with this right here right now." Simpson complained to the district manager, Joel Cogdell, and the district HR manager, James Turner, about his treatment by Cocke. This turned out to be a mistake, as Cocke then became retaliatory: He said that "You think that was a smart move by calling the District Office?" And then he told me . . . "You don't know . . . I paint targets on peoples' back[s] that cross me."

12

[Plaintiff's brief at 6 (record citations omitted)].[2]

Without question, there is a dramatic difference in plaintiff's and Cocke's accounts of their January 2015 confrontation, and this difference makes Cocke's motivations and biases *vis a vis* plaintiff very much relevant in this case. It is clear that, by calling AACG to investigate plaintiff's conduct, Cocke took a step which, a jury could reasonably find, contributed to his eventually receiving a "final warning" and being terminated. That being the case, if those negative evaluations were written not as part of an even-handed evaluation of plaintiff's work performance, but were, instead, part of a racial vendetta to fire him, then they might well be viewed by a jury as evidence that race was a factor in plaintiff's termination.

It strikes this court that Home Depot cannot have its cake and eat it too on this issue. That is, Home Depot cannot on the one hand argue that plaintiff was a substandard employee based partly upon negative evaluations written by Cocke and then, on the other hand, turn around and argue that this former manager's alleged racist views had no role in his firing. If Ammar's testimony is to be believed, then these negative evaluations were written by an individual who repeatedly promised to "get rid of that nigger." It is not at all clear to this court why, in a race discrimination case, alleged racist statements by a manager who very likely contributed to plaintiff's firing should be considered irrelevant.

In arguing that Cocke's alleged remarks are irrelevant, defendant notes that the Fifth Circuit has held that in cases where a plaintiff offers remarks as direct evidence of

---

[2] Plaintiff notes that district manager Cogdell, to whom plaintiff complained about Cocke's conduct, is African-American. In his deposition, plaintiff testified that Cocke told him that Cogdell refused to return his phone calls and that Cocke asked plaintiff in frustration "What do I have to do? Do I have to be fucking black to get him to call me back?" [Plaintiff's depo at 113]. Plaintiff also offered his opinion, which this court will disregard since it appears to be based upon inadmissible lay opinion evidence, that Cocke transferred to Jackson in order to get away from Cogdell's supervision.

13

discrimination, they are only sufficient to overcome a summary judgment motion if they are "1) [race] related; 2) proximate in time to the termination; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Reed v. Neopost USA, Inc.,* 701 F.3d 434, 441 (5th Cir. 2012). Defendant argues that this four-part test is not met with regard to Cocke's remarks, since they were, among other things, not "proximate in time to the termination." *Reed,* 701 F.3d 441. While this may well be true, the fact remains that Cocke's remarks are merely offered as cumulative evidence of discrimination in this case, and not as an independently sufficient basis for overcoming defendant's summary judgment motion. It appears that all four elements of the *Reed* test are met with regard to Gentry's alleged promise to fire plaintiff's "black ass," and this alone supports a denial of defendant's summary judgment motion under Title VII's rather lenient "motivating factor" standard.

In light of the foregoing, the *Reed* standard does not apply to Cocke's alleged remarks, and the issue is simply whether those remarks constitute relevant information in this case. This court concludes that they do. While this court expresses no view regarding the reliability of Ammar's testimony, it is certainly arguable that *if* the evidence demonstrates that Home Depot hired a blatant racist as its Horn Lake store manager, then it should not be heard to complain about this fact being brought to the jury's attention, under the circumstances of this case.[3] This is particularly true since, once again, defendant is seeking to use that same manager's negative evaluations in support of its decision to fire plaintiff.

---

[3] In so stating, this court is offering no opinion whether such is the case, and defendant clearly believes that Ammar is a disgruntled former employee with a vendetta against the company. It is for a jury to determine the credibility of Ammar's testimony.

14

Plaintiff notes that another Home Depot employee filed an EEOC complaint of racial discrimination against Cocke, and it thus seems clear that Ammar is not alone in levying charges of racial discrimination against this individual. Prior to plaintiff's arrival at the Horn Lake store, a department head named Renea Bateman filed a charge with the EEOC because "of the racial atmosphere in the store," during the time it was managed by Cocke. Home Depot has brought another motion in limine to exclude this EEOC complaint from the jury's attention, and it certainly seems that it is expending a great deal of energy in arguing that various unhelpful facts should be kept hidden from the jury in this case. In the court's view, a company in Home Depot's position might reasonably wonder whether the necessity for it to repeatedly file such motions is indicative of a problem which needs addressing.

Regardless, this court regards Bateman's EEOC complaint as having at least some potential relevance in this case, since plaintiff has managed to make a reasonable argument (supported by proof) that it has a connection to the facts of this case. In his deposition, Ammar testified that the EEOC complaint against Cocke was the very reason plaintiff was hired as an (African-American) employee, namely to insulate Cocke and Home Depot from any allegations of racial bias following the complaint against them:

> A. So, when they fired Drew for performance, they knew they had to bring a black manager into that store, for the simple fact that --
> Q. Did somebody tell you that?
> A. Josiah, yeah. He said they had to bring a black manager inside the store to balance it out.

[Ammar depo. at 16]. While this court has excluded any such testimony by Ammar which is not based on personal knowledge, he testified, as quoted above, that Cocke specifically told him that plaintiff was hired to deflect any suspicions of racial discrimination. Ammar's testimony in this regard thus appears to be based upon his personal knowledge.

15

Cocke's written performance evaluations of plaintiff are a significant issue in this case, and this court considers it appropriate to consider the extent to which those evaluations were influenced by the EEOC complaint which was filed against him. In the court's view, plaintiff has a good faith jury argument that, to the extent that Cocke appeared to go out of his way to be fair and evenhanded in some of his written evaluations of him, he was simply "polishing up his act" in light of the EEOC complaint and that his genuine motivations were very different. Defendant will, no doubt, argue the opposite, and this court offers no opinion regarding the truth as it relates to this issue. It does seem clear, however, that the EEOC complaint which was filed against Cocke is, at least potentially, of significant importance to understanding his actions *vis a vis* plaintiff, as an African-American employee.

It strikes this court that Home Depot could easily argue that Ammar's testimony regarding the EEOC complaint is evidence that, as a corporation, it was making efforts to combat racial discrimination. For example, Ammar testified that:

> Ammar: And then Josiah wrote Renea up for impeding customer service; right? And then that store got in trouble with the EEOC because Renea filed an EEOC claim against Josiah. Well, Josiah had to turn in a dissertation to everybody he's hired, he's fired, he's promoted, demoted by dates and race, because they weren't -- I mean, they are digging in to see if he's targeting race.[4]

[Id. at 15]. While Ammar's testimony as a whole is clearly adverse to Home Depot, his testimony that "they are digging in to see if he's targeting race" does appear to suggest that defendant was making good faith efforts to determine whether Cocke was a racist. Regardless of whether this evidence is more helpful to plaintiff or defendant, the fact that an EEOC complaint was filed against Cocke does appear to be relevant to plaintiff's claims, and not simply a case of

---

[4] As with his other testimony, Ammar will need to establish that he has personal knowledge regarding this testimony at trial, and he will not be permitted to simply offer speculation to the jury.

16

an unrelated "me too" claim by a co-worker. Defendant's motion to exclude evidence of Bateman's EEOC complaint will therefore be denied. This court does agree that Bateman's complaint has only limited relevance in this case, however, and it will accordingly grant plaintiff only limited leeway to inquire into this matter.[5]

Having addressed the most important evidentiary issues in this case, this court has no doubt that, in light of the statements attributed to Gentry and Cocke, genuine fact issues exist regarding whether race was at least a motivating factor in plaintiff's termination. In the court's view, the fact that plaintiff seeks to prove discrimination by direct evidence likely renders the *McDonnell Douglas* burden-shifting framework inapplicable in this case, since it provides a vehicle for analyzing discrimination claims based on *circumstantial* evidence.[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1917, 36 L. Ed. 2d 668 (1973). Assuming this is incorrect, however, then the court concludes that summary judgment would likewise be improper under *McDonnell Douglas*, which first requires a prima facie showing by plaintiff that: (1) he is a member of a protected class; (2) he was qualified for the employment position at issue; (3) he suffered an adverse employment action; and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances, or he was replaced by someone outside of the protected class. *Meinecke v. H&R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 1995).

In arguing that the fourth element of the prima facie test is not met, defendant argues that:

As explained above, Plaintiff, who is African-American, and Ronnie Dinolfo, who is

---

[5] This court will rule upon any hearsay or other objections at trial, since it is not clear at this juncture exactly how plaintiff will seek to proceed in this context.
[6] Indeed, this conclusion appears to be supported by defendant's citation to the *Reed* standard, which, as quoted above, applies to statements used as "direct" evidence of discrimination.

> Caucasian, were terminated as ASM's from the Horn Lake store around the same time. They were replaced by Robert Bigelow (Caucasian) and Anthony Lockhart (African-American). While Mr. Bigelow was technically Plaintiff's replacement, the hiring of Mr. Bigelow and Mr. Lockhart to replace Plaintiff and Mr. Dinolfo shows that race had absolutely nothing to do with Plaintiff's termination. Therefore, Plaintiff cannot establish a prima facie case of discrimination under this prong.

[Defendant's brief at 19]. Defendant thus concedes that plaintiff was "technically" replaced in his position by a white man, and this strikes this court as sufficient to establish a prima facie case under the *McDonnell Douglas* framework. This court further concludes that the previously-discussed racial statements allegedly made by Gentry and Cocke are more than sufficient to establish fact issues regarding pretext, even assuming that the *McDonnell Douglas* framework is applicable in this case (which seems doubtful). Regardless of whether the *McDonnell Douglas* framework or direct evidence standards apply in this case, this court concludes that genuine fact issues exist regarding whether race was a motivating factor in plaintiff's termination, and defendant's motion for summary judgment will therefore be denied.

It is therefore ordered that defendant's motion for summary judgment [36-1] is denied, and its motion in limine [47-1] is granted in part and denied in part.

So ordered, this the 2nd day of May, 2018.

/s/ Michael P. Mills
U.S. DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI